# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**TREE OF LIFE CHRISTIAN SCHOOLS,**

        **Plaintiff,**

**-v-**
                              **Case No.: 2:11-cv-09**
                              **JUDGE GEORGE C. SMITH**
                              **Magistrate Judge Deavers**

**THE CITY OF UPPER ARLINGTON,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on remand from the United States Court of Appeals for the Sixth Circuit. The parties have agreed to "submit this case on remand to the Court on 'motions for final judgment' and waive any oral presentation of evidence. The parties agree that the Court will consider the motions' briefing and record evidence and issue a final judgment based on its findings of fact and conclusions of law." (Doc. 95, Stipulations ¶ 1). The cross-motions for final judgment and the responses have been filed and the motions are now ripe for review. (*See* Docs. 96 and 97). For the reasons that follow, the Court **GRANTS** Defendant's Motion for Final Judgment and **DENIES** Plaintiff's Motion for Final Judgment.

## I.     BACKGROUND

### A.     The Parties

#### 1.     Tree of Life Christian Schools

Plaintiff, Tree of Life Christian Schools ("Plaintiff" or "Tree of Life"), is a private Christian school located in Columbus, Ohio. Tree of Life has a current enrollment of 532

students and currently employs 150 staff, including teachers, coaches, administrators, and seasonal staff. The current annual payroll is approximately $2,535,301.00. (Doc. 96-4, Marrah Decl. ¶ 3). Tree of Life operates schools serving various grades ranging from preschool to twelfth grade at different locations around the Columbus metropolitan area, including the Northridge campus, Indianola campus, and Dublin campus. (Doc. 20, Stipulations ¶ 7). Tree of Life operates as a non-profit religious corporation under the laws of the State of Ohio, with its principal place of business located at 935 Northridge Road, Columbus, Ohio. (Doc. 2, Verified Compl. ¶ 8).

Tree of Life was originally founded in 1978, and organized as an Ohio not for profit corporation on or about April 10, 1981. (Doc. 20, Stipulations ¶ 3). The primary purpose of Tree of Life is "to assist parents and the Church in educating and nurturing young lives in Christ." (Doc. 2, Verified Compl. ¶ 16). Their mission statement reads: "In partnership with the family and the church, the mission of Tree of Life Christian Schools is to glorify God by educating students in His truth and discipling them in Christ. 'A cord of three strands is not easily torn apart.' (Ecclesiates 4:12)." (*Id*. ¶ 17). Tree of Life's vision statement states: "As students are led to spiritual, intellectual, social and physical maturity, they become disciples of Jesus Christ, walking in wisdom, obeying His word and serving in His Kingdom." (*Id*. ¶ 18). Tree of Life describes their philosophy of education as "quintessentially and undeniably Christian," and believes this philosophy "puts the Bible at the center and asks the student to evaluate all he/she studies through the lens of God's Word." (*Id*. ¶ 19). Tree of Life requires all parents who enroll their children to certify that they agree with the mission, philosophy, and vision. All faculty and staff must also sign a statement of faith, and must be active members of a

local "Bible-believing congregation." (*Id.* ¶¶ 21–22).

Tree of Life represented at the time it initiated this case that it had limited space in its current buildings for new students as the Indianola and Dublin campuses are located within existing church buildings of sponsoring churches of Tree of Life. Despite representing in 2011 that there were no long-term leases with these churches and that their facilities were old, there has been no recent representation or evidence submitted by Tree of Life that they cannot continue to operate at these current locations.

In 2006, Tree of Life began searching for property that would allow for expansion. After reviewing more than twenty sites and facilities within Franklin County, Tree of Life finally settled on the property located at 5000 Arlington Centre Boulevard in Upper Arlington, Ohio (hereinafter "the Property"). The Property contains an office building that is approximately 254,000 square feet and is centrally located to serve all of Tree of Life's current families. The Property's size would allow for consolidation of preschool through twelfth grade at one location, reduction in staff and transportation costs, and accommodation of more students. Tree of Life ultimately purchased the property on August 11, 2010. (Doc. 2, Verified Compl. ¶¶ 39-50).

### 2. The City of Upper Arlington

Defendant, the City of Upper Arlington, Ohio, ("the City" or "Upper Arlington"), is a public body authorized under the laws of the State of Ohio, and acting under the color of state law. Upper Arlington is a suburban community that is a land-locked and fully developed. On March 26, 2001, the City issued a development plan ("the Master Plan") to provide guidance for its land use with "considerable emphasis on the need to cultivate the commercial use of land in order for the City to be financially stable." (Doc. 55-2, Gibson Aff. ¶¶ 2–3). All land and

development in Upper Arlington is regulated by the Upper Arlington Unified Development Ordinance ("the UDO"), which employs "non-cumulative" or "exclusive" zoning. Article 5 of the UDO sets forth the regulations applicable to the use and development of land in Upper Arlington and establishes the zoning districts, including residential, commercial, planned, and miscellaneous. (Doc. 97-1, Current UDO).

**B.      Procedural History**

Plaintiff initiated this case on January 5, 2011, with the filing of the Verified Complaint, alleging violations of its rights to free speech, free exercise of religion, peaceable assembly, equal protection, due process, and the establishment clause under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Ohio Constitution, and alleging a violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). (*See generally* Doc. 2).

Plaintiff filed a Motion for Preliminary Injunction on January 28, 2011, seeking to enjoin Defendant, the City of Upper Arlington, from enforcing Article 5.01, Table 5-C of the UDO prohibiting Plaintiff from operating a religious school in the ORC Office and Research District. Plaintiff sought injunctive relief on two of its claims: violation of the RLUIPA and violation of equal protection. On April 27, 2011, this Court denied Plaintiff's Motion for Preliminary Injunction. (Doc. 23). Despite finding that Plaintiff demonstrated a potential likelihood of success on the merits of its RLUIPA claim, the Court found that the balance of harms did not strongly justify the issuance of a preliminary injunction.

Following discovery in this case, the parties filed cross-motions for summary judgment. On August 16, 2012, the Court issued an Opinion and Order granting Defendant's motion

finding that the case was not ripe for review because Tree of Life had not petitioned the City to

rezone the property at issue.  (Doc. 70).  Plaintiff appealed this decision to the United States

Court of Appeals for the Sixth Circuit.  While the appeal was pending, on December 21, 2012,

Tree of Life submitted an application to the City seeking to amend the City's UDO to allow

private religious schools as a permitted use in the ORC Office and Research District.[1]  On March

---

[1] Rezoning is governed by Section 4.04 of the UDO titled "UDO and Official Zoning Map Amendments" which specifically provides:

B.      Amendment Process: Amendments may be initiated in one of the following ways:

1.  By the filing of an application to BZAP [Board of Zoning and Planning] by the owner(s) of property within the area proposed to be affected or changed by said amendment;

2. By the adoption of a motion by BZAP; or

3. By the adoption of a motion by City Council and referral to BZAP.

All text and map amendments shall follow the same procedure. City Council initiated text or map amendments shall be referred to BZAP for recommendation prior to Council consideration.

C.      Standards for Approval: The following criteria shall be followed in approving zoning map amendments to the UDO:

1.  That the zoning district classification and use of the land will not materially endanger the public health or safety;

2.  That the proposed zoning district classification and use of the land is reasonably necessary for the public health or general welfare, such as by enhancing the successful operation of the surrounding area in its basic community function or by providing an essential service to the community or region;

3.  That the proposed zoning district classification and use of the land will not substantially injure the value of the abutting property;

4.  That the proposed zoning district classification and use of the land will be in harmony with the scale, bulk, coverage, density, and character of the area the neighborhood in which it is located;

5.  That the proposed zoning district classification and use of the land will

11, 2013, the Upper Arlington City Council ("City Council") denied the application. The Council provided several reasons for denying the application including that allowing private religious schools as a permitted use in the ORC Office and Research District would "significantly diminish expected tax revenues per square foot due to relatively low salaries and low density of professionals per square foot" and if private religious schools were permitted, but not non-religious schools, it would create a facial First Amendment problem. (*See* City Council Minutes, Doc. 81–7, Page ID# 2463).

Tree of Life moved to supplement the record on appeal with the denial of the rezoning and the Sixth Circuit granted that request and remanded the case to this Court "to determine in the first instance whether the claims are ripe." *Tree of Life Christian Schs. v. City of Upper Arlington*, 536 F. App'x 580, 583 (6th Cir. 2013).

Following remand, on October 17, 2013, Tree of Life submitted a second application to the City to rezone its property. This time, Tree of Life sought to rezone only its 15.81–acre parcel from the ORC Office and Research District to residential. Upper Arlington's Senior Planning Officer, Chad Gibson, submitted a staff report to City Council on November 25, 2013, stating:

> Staff believes that the proposed rezoning is in direct opposition to numerous core

---

> generally conform with the Master Plan and other official plans of the City;
>
> 6. That the proposed zoning district classification and use of the land are appropriately located with respect to transportation facilities, utilities, fire and police protection, waste disposal, and similar characteristics; and
>
> 7. That the proposed zoning district classification and use of the land will not cause undo [sic] traffic congestion or create a traffic hazard.

Master Plan goals and objectives. The proposed zoning change would eliminate nearly 16 acres of extremely limited ORC–zoned ground, which will reduce the amount of office and research space within the City. The Master Plan clearly indicates that the Henderson Road corridor has the greatest opportunity for intense office use, and approving such a rezoning would be contrary to the City's long-term financial interests. The majority of land use categories within Upper Arlington currently permits schools, public or private, religious or secular. The applicant has failed to establish the necessity of changing the zoning of an established office park from commercial to residential given the potential detrimental impacts to the City.

A K–12 school has inherent characteristics which can be intrusive and destructive to an office park. Traffic, including school bus circulation, loading and unloading, can be challenging for an area to accommodate. A large number of young drivers and parents arriving and departing at similar (peak) times can tax the roadways and related infrastructure, reducing the level of service for signalized intersections. After–school activities such as band and theater productions can also bring large number of parents and students to an area, often necessitating overflow parking demands. Outdoor events such as band practice can create noise impacts for office workers who are attempting to do business and/or serve clients. Furthermore, after reviewing the application, revised traffic study, and other materials, BZAP unanimously recommended against the proposed zoning map amendment.

(Doc. # 81-9, November 25, 2013 Staff Report to City Council, PAGEID# 2490).

Additionally, City Council heard from the Upper Arlington City Attorney who spoke to the seven points of analysis required for rezoning applications by Article 4.04(c) of the UDO. The focus of the analysis was that rezoning to eliminate commercially zoned property would be contrary to the Master Plan. Based on the staff report and the comments by the Upper Arlington City Attorney made during the December 9, 2013 City Council meeting, the Council denied Tree of Life's rezoning request. (*See* Doc. 81–11, Page ID# 2577–80, December 9, 2013 Upper Arlington City Council meeting minutes).

Following the denial of the second rezoning request, the parties agreed that there were no more administrative avenues to pursue and no genuine issues of material fact. Therefore, by agreement, the parties submitted cross-motions for summary judgment for the Court's

consideration.  (*See* Docs. 79 and 82).  On April 18, 2014, this Court granted Defendant's

Motion for Summary Judgment and denied Plaintiff's Motion for Summary Judgment.  (*See*

Doc. 86).  The Court concluded that the City of Upper Arlington's UDO did not violate the

Equal Terms provision of RLUIPA.  Additionally, the Court found that the City's UDO does not

violate the Equal Protection Clause of the Fourteenth Amendment, nor is it unconstitutionally

vague.  Finally, the Court held that the City's UDO did not violate the Free Exercise and

Establishment Clauses of the First Amendment, nor was there any restraint on Plaintiff's

exercise of free speech.  The Court declined to exercise supplemental jurisdiction over Plaintiff's

state law claims and those were dismissed without prejudice.  (*Id.*).

Plaintiff filed a Notice of Appeal on May 8, 2014.  (Doc. 88).  The Sixth Circuit heard

oral argument on April 29, 2015, and issued their decision on May 18, 2016, with the mandate

following on July 27, 2016.  (Docs. 89, 90).  The Sixth Circuit found a genuine issue of material

fact on the as-applied challenge of RLUIPA and reversed and remanded solely on that issue.

The dismissal of Plaintiff's remaining claims were either not challenged or upheld.  *Tree of Life*

*Christian Schs. v. City of Upper Arlington*, 823 F.3d 365, 372 (6th Cir. 2016).

On remand, the Sixth Circuit provided the following instruction to this Court to answer

the remaining questions of fact:

> Are there nonreligious assemblies or institutions to which the court should compare
> Tree of Life Christian Schools because they would fail to maximize income-tax
> revenue, and if so, would those assemblies or institutions be treated equally to TOL
> Christian Schools?

*Id.*

## II.    FINDINGS OF FACT

The City of Upper Arlington is landlocked and primarily residential, only 4.7% of its

useable land area is zoned "Commercial," and only 1.1% is in office use.  To maximize

revenues, the City developed the Master Plan to maintain its "quality of life and attractiveness as

a residential community, and meet its capital needs and fund city services."  (Doc. 55-2, Gibson

Aff. ¶ 4(c)).  Therefore, full use of existing office space, as well as the development of additional

office space, is critical for the City's financial stability.  The purpose behind the Master Plan was

to create opportunities for office development that emphasize high-paying jobs.  (Doc. 55-2,

Gibson Aff. ¶¶ 3–4).  The regulatory purpose of the "ORC Office and Research District" in the

City's Master Plan is set forth in Section 5.03(A)(6) of the UDO as follows:

> *ORC office and research district*: The purpose of this district is to allow offices and
> research facilities that will contribute to the City's physical pattern of planned,
> healthy, safe, and attractive neighborhoods.  The ORC district should also provide
> job opportunities and services to residents and contribute to the City's economic
> stability.  Permitted uses in the ORC district are: business and professional offices,
> research and development, book and periodical publishing, insurance carriers,
> corporate data centers, survey research firms, bank finance and loan offices,
> outpatient surgery centers, hospitals, and such permitted uses as are set forth or may
> in the future be set forth in Table 5-C.  At least eighty-five percent (85%) of the
> gross floor area of any building located in an ORC district shall be exclusively
> dedicated to one of these permitted uses.  The lesser of fifteen percent (15%) of the
> gross floor area or ten thousand (10,000) square feet of any building located in an
> ORC district may be dedicated to secondary conditional uses as listed in Table 5-C.
> Secondary conditional uses shall be subject to the conditional use review process set
> forth in UDO Subsection 4.05(F).

(Doc. 97-1, UDO at 4).  The purpose of the ORC Office and Research District serves a

compelling state interest.  A complete list of permitted uses appears in Table 5-C of the UDO.

(Doc. 97-1, UDO Table 5–C at 15–19).  Schools of any type are not permitted in the ORC Office

and Research District.  (Doc. 55-2, Gibson Aff. ¶¶ 5–7).  Schools are permitted in residential

zones which comprise 95% of the developed land in the City.  (*Id*. ¶ 8).

Section 5.01(B) of the UDO governs the rules of application.  Section 5.01(B)(2), entitled

"Permitted Uses," provides:

> Only a use designated as a permitted use shall be allowed as a matter of right in a zoning district and any use not so designated shall be prohibited except, when in character with the zoning district, such other additional uses may be added to the permitted uses of the zoning district by an amendment to this UDO. Only lawful uses shall be permitted and prior zoning approval of a use does not override state or federal laws.

(Doc. 97-1, UDO at 1). Section 5.01(B)(3), entitled "Conditional Uses," states:

> A use designated as a conditional use shall be allowed in a zoning district when such conditional use, its location, extent and method of development will not substantially alter the character of the vicinity or unduly interfere with the use of adjacent lots in the manner prescribed for the zoning district, and is not inconsistent or contrary to master plan objectives related to uses. To this end BZAP [Board of Zoning and Planning] shall, in addition to the development standards for the zoning district, set forth such additional requirements as will, in its judgment, render the conditional use compatible with the existing and future use of adjacent lots and the vicinity. Additional standards for conditional uses are listed in Section 6.10.

(*Id.*). The Property is the largest office building in Upper Arlington, located at 5000 Arlington Centre Boulevard, in the ORC Office and Research District. The commercial office building was previously occupied by AOL/Time Warner, and it generated substantial income tax and property tax revenues for the City. In 2001, it accounted for 29% of the City's income tax revenues. Time Warner ceased operations at this location in 2009. Requiring commercial use of this Property is consistent with the language and purposes of the ORC Office and Research District, as well as the Master Plan. (Doc. 18, Affidavit of Catherine Armstrong, Finance Director for Upper Arlington ¶¶ 4–7 (hereinafter "Armstrong Aff.")).

In early 2009, Upper Arlington officials became aware that Tree of Life was considering purchasing the commercial office building for use as a school. On March 16, 2009, Matthew Shad, Deputy City Manager for Economic Development in Upper Arlington, met with Don

Roberts of CB Richard Ellis, the listing agent, and advised him that schools were not a permitted use for that building. (Doc. 62-2, Shad Aff. ¶¶ 4–7). On October 1, 2009, Tree of Life contracted to purchase the commercial office building, contingent upon zoning allowance. On November 11, 2009, Shad also advised the Tree of Life school superintendent directly that schools were not a permitted use of the Property. (*Id.* ¶ 9).

Tree of Life then engaged in the following proceedings seeking permission to operate a school at the Property:

• December 21, 2009 – Conditional Use Permit Application filed with Upper Arlington requesting to "use the property for a place of worship, church and residential, to the extent that residential includes a private school." (Doc. 2, Verified Compl. Ex. A).

• December 28, 2009 – Mr. Gibson denied the Application stating "a private school is neither a permitted use nor a conditional use in the ORC, Office and Research District (*see* UDO Table 5-C Article 5.01)." He further instructed that "the applicant should submit a rezoning application if they wish to pursue a private school at this location." (Doc. 2, Verified Compl. Ex. B).

• January 5, 2010 – Tree of Life appealed Mr. Gibson's determination to the Board of Zoning and Planning ("BZAP"). And in a parallel track, Tree of Life wrote to Mr. Gibson asking for clarification as to "whether these uses, which are contained in the application, are, or are not, Conditional Uses in the ORC zoning district in the Upper Arlington UDO."[2] (Doc. 2, Verified Compl. Ex. C).

_____

[2] Mr. Gibson's initial letter dated December 28, 2009, determined that the Tree of Life school was not a residential use that could be considered as a conditional use in the ORC Office and Research District; however, there was no determination as to whether Tree of Life was a "Place of Worship" or a "Church."

- February 26, 2010 – Mr. Gibson confirmed that the BZAP hearing on March 1, 2010, would consider the conditional use application for "a private school with ancillary uses." He further stated that "At this time, no conditional use application has been submitted for a church at this site." (Doc. 2, Verified Compl. Ex. G).

- March 1, 2010 – BZAP held a public hearing and ultimately issued an Order upholding Mr. Gibson's determination "that the conditional use application proposing a private school in an ORC District was inappropriate and would not be scheduled for BZAP review." (Doc. 2, Verified Compl. Ex. D).

- April 2, 2010 – Tree of Life appealed the BZAP decision to City Council.

- April 26, 2010 – City Council held a public hearing on the appeal and ultimately voted to uphold the decision of the BZAP, finding "a private school is neither a permitted or conditional use in the Office and Research District and that rezoning is required if Appellant plans to pursue a private school at this location." (Doc. 2, Verified Compl. Ex. F).

- June 7, 2010 – BZAP held a public hearing on the parallel proceeding and concluded that "for purposes of the UDO, the proposed primary use of the property as a private school does not constitute a 'place of worship, church' as that term is used in Table 5-C of Article 5 of the UDO, and is therefore not a conditional use in the ORC District." (Doc. 2, Verified Compl. Ex. I).

- June 18, 2010 – Tree of Life appealed the BZAP decision to City Council.

- August 11, 2010 – Tree of Life closed on the purchase of the Property with a purchase price of $6.5 million.

- August 16, 2010 – City Council held a public hearing and issued findings affirming the

prior decisions that "for purposes of the UDO, the proposed primary use of the property as a private school does not constitute a 'place of worship, church' as that term is used in Table 5-C of Article 5 of the UDO, and is therefore not a conditional use in the ORC District."  (Doc. 2, Verified Compl. Ex. K).

• Tree of Life appealed the final decision of the Upper Arlington City Council to the Environmental Division of the Franklin County Municipal Court, but ultimately withdrew that appeal.

• December 21, 2012 – Tree of Life submitted an application to the City seeking to amend the City's UDO to allow private religious schools as a permitted use in the ORC Office and Research District.

• March 11, 2013 – Upper Arlington City Council denied the application to amend the City's UDO to allow private religious schools in the ORC Office and Research District. (Doc. 81-7, Page ID# 2463, City Council Minutes).

• October 17, 2013 – Tree of Life submitted a second application to the City to rezone only its 15.81 acre parcel to residential.

• December 9, 2013 – City Council denied Tree of Life's rezoning request.  (*See* Doc. 81-11, Page ID# 2577– 80, Minutes of the December 9, 2013 Upper Arlington City Council meeting).

### III. CONCLUSIONS OF LAW

Plaintiff, Tree of Life, initiated this case against Defendant, the City of Upper Arlington, asserting claims for violations of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the right to free exercise of religion, the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause, the Free Speech Clause, the right to peaceable assembly under the First Amendment; the Establishment Clause, and Article I, Section 7 of the Ohio Constitution. The only remaining claim before the Court following remand from the United States Court of Appeals for the Sixth Circuit is Plaintiff's allegation that Upper Arlington's UDO violates RLUIPA.

The Sixth Circuit instructed this Court to resolve the following factual issues:

(1)     Are there nonreligious assemblies or institutions to which the court should compare Tree of Life Christian Schools because they would fail to maximize income-tax revenue?

(2)     If so, would those assemblies or institutions be treated equally to Tree of Life Christian Schools?

*Tree of Life Christian Schs.*, 823 F.3d at 372.

The parties have filed cross-motions for final judgment on this remaining issue. Plaintiff seeks a finding that the Upper Arlington UDO as applied to Tree of Life violates RLUIPA's equal terms provision. And Defendant seeks a finding that there has been no violation of RLUIPA.

## A.     RLUIPA Claim

Plaintiff Tree of Life argues that Upper Arlington's UDO violates RLUIPA's "equal terms" provision, which is set forth in Section (b)(1) as follows: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(1).  "The equal-terms section is violated whenever religious land uses are treated worse than comparable nonreligious ones, whether or not the discrimination imposes a substantial burden on the religious uses."  *Digrugilliers v. City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007) (citing *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1002–03 (7th Cir. 2006)).  While this provision of RLUIPA "has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis."  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1229 (11th Cir. 2004).  RLUIPA does not require a city to give religious assemblies and institutions more rights than other users of land in the same zones have. *River of Life Kingdom Ministries v. Village of Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010) (citing *Digrugilliers*, 506 F.3d at 615).  "RLUIPA's Equal Terms provision requires equal treatment, not special treatment."  *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1313 (11th Cir. 2006).  Further, "not just any imposition on religious exercise will constitute a violation of RLUIPA.  Instead, a burden must have some degree of severity to be considered 'substantial.'"  *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996 (6th Cir. 2017) (citing *Int'l Church of the Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011) (substantial burden "must impose a significantly great restriction or onus upon [religious] exercise")).

RLUIPA explicitly places the burden on the plaintiff to initially establish a *prima facie*

case supporting its claim.  42 U.S.C. § 2000cc-2(b).  Plaintiff must prove the following four elements to establish an "equal terms" violation of RLUIPA:  "(1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the religious assembly on less than equal terms, with (4) a nonreligious assembly or institution."  *Primera Iglesia*, 450 F.3d at 1307.  The statute does not define the meaning of "equal terms" and not all courts are in agreement as to its meaning.  *See Roman Catholic Bishop of Springfield v. City of Springfield*, 760 F. Supp. 2d 172, 188, n. 11 (D. Mass. 2011) (comparing cases).  The disagreement among the circuits "centers on how broadly to construe the phrase 'nonreligious assembly or institution'" and what is a similarly situated comparator.  *Id.* at 188.  The Eleventh Circuit requires a plaintiff to demonstrate unequal treatment as compared to any secular institution or assembly.  *See, e.g.*, *Midrash*, 366 F.3d at 1230–31.  The Third Circuit has held that "a regulation will violate the [e]qual [t]erms provision only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated *as to the regulatory purpose*."  *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007).  The Seventh Circuit applied a modified version of the Third Circuit's test, concluding that the focus should be on secular assemblies or institutions similarly situated as to the "accepted zoning criteria" rather than the regulatory purpose.  *River of Life*, 611 F.3d at 371.[3]

In addition to the aforementioned circuits, two additional circuit courts have addressed

---

[3] The Sixth Circuit had not yet adopted a test for evaluating a RLUIPA equal terms claim and in considering this case concluded "[w]e need not definitely choose among the various tests used by other circuits in order to resolve this case."  *Tree of Life Christian Schs.*, 823 F.3d at 370.  This Court analyzed the different tests set forth by the Third, Seventh, and Eleventh Circuits in detail in a previous Opinion and Order.  (*See* Doc. 23).  The Court does not find it necessary to fully repeat the analysis with respect to the tests of each of the aforementioned circuits.

the equal terms provision of RLUIPA: *Elijah Group v. City of Leon Valley*, 643 F.3d 419 (5th Cir. 2011) and *Centro Familiar Cristiano Buenas Nevas v. City of Yuma*, 651 F.3d 1163 (9th Cir. 2011). The Fifth Circuit held that a zoning ordinance violated RLUIPA's equal terms provision because "it prohibits the Church from even applying for a SUP [Special Use Permits] when, e.g., a nonreligious private club may apply for a SUP." *Elijah Group,* 643 F.3d at 424. The court held that the equal terms provision of RLUIPA "must be measured by the ordinance itself and the criteria by which it treats institutions differently." *Id.* The Fifth Circuit explicitly stated that it was not adopting any particular test adopted by another circuit, but its test appears to be similar to that used by the Third, Seventh, and Second Circuits who view the equal terms provision in light of the zoning criteria or purpose of the zoning ordinance.[4]

The Ninth Circuit also construed the equal terms provision, adopting the Third Circuit's approach along with the Seventh Circuit's refinement of the test. *See Centro Familiar*, 651 F.3d at 1172–73. The Ninth Circuit held that the "city may be able to justify some distinctions drawn with respect to churches, if it can demonstrate that the less-than-equal-terms are on account of a legitimate regulatory purpose, not the fact that the institution is religious in nature." *Id.* The court realized that "our analysis is about the same as the Third Circuit's" but also recognized that the Seventh Circuit's refinement of this test was appropriate. The court ultimately stated the test to be used as follows:

> The city violates the equal terms provision only when a church is treated on a less than equal basis with a secular comparator, similarly situated with respect to an accepted zoning criteria. The burden is not on the church to show a similarly situated secular assembly, but on the city to show that the treatment received by the

---

[4] *See Lighthouse Institute,* 510 F.3d at 264; *River of Life,* 611 F.3d at 371; *Third Church of Christ Scientist v. City of New York*, 626 F.3d 667, 669–70 (2nd Cir. 2010).

church should not be deemed unequal, where it appears to be unequal on the face of the ordinance.

*Id.* at 1173.[5]

As framed by the Sixth Circuit for remand, this Court is challenged with resolving Plaintiff's as-applied equal terms RLUIPA claim.[6]  There is no dispute between the parties that Plaintiff Tree of Life is a religious assembly or institution[7] and that it has been subjected to a land use regulation, in this case Upper Arlington's UDO zoning law which prohibits all schools from operating in the ORC Office and Research District.  The analysis therefore turns on whether Upper Arlington's UDO treats Plaintiff, a religious school, on less than equal terms with a nonreligious assembly or institution.

Again, The Sixth Circuit instructed this Court to resolve the following factual issues:

---

[5] The Ninth Circuit noted that its test departed from that utilized by the Third Circuit in its burden shifting.  The Third Circuit placed the burden on the church while the Ninth Circuit placed the burden on the government, once a *prima face* case is established.  *Centro Familiar*, 651 F.3d at 1173.

[6] Plaintiff Tree of Life originally challenged Upper Arlington's UDO both on its face and as applied.  This Court has previously found that Upper Arlington's UDO is facially neutral.  The August 16, 2012 Opinion and Order specifically states:

> Plaintiff fails to explain how the UDO is unconstitutional on its face.  There is no evidence that Upper Arlington's UDO allows other non-secular uses that are not permitted in the ORC Office and Research District to not seek rezoning.  Upper Arlington has been consistent from the time it became aware that Plaintiff intended to purchase the commercial building that schools, both secular or non-secular, are not permitted in the ORC, Office and Research District.

(Doc. 70 at 20).  This remains true.  Upper Arlington treats both religious schools and secular schools the same.  In fact, both secular and non-secular schools are permitted in over 95% of the City of Upper Arlington that is zoned residential.

[7] Many courts analyzing RLUIPA claims have found facilities used for religious education to fall under RLUIPA's protection.  *See Living Water Church of God v. Charter Twp. of Meridian*, 384 F. Supp. 2d 1123, 1129–30 (W.D. Mich. 2005) ("Plaintiff's use of the proposed facility for a religious oriented school and for other ministries of the church constitutes religious exercise"); *see also Castle Hills First Baptist Church v. City of Castle Hills*, 2004 U.S. Dist. LEXIS 4669, at * 38 (W.D. Tex. Mar. 17, 2004); *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1213 (C.D. Cal. 2002).

(1)    Are there nonreligious assemblies or institutions to which the court should compare Tree of Life Christian Schools because they would fail to maximize income-tax revenue?

(2)    If so, would those assemblies or institutions be treated equally to Tree of Life Christian Schools?

*See Tree of Life Christian Schs*., 823 F.3d at 372.  The Sixth Circuit held that Tree of Life pled sufficient facts to allege that at least some assemblies or institutions permitted in the ORC Office and Research District are

> situated, relative to the government's regulatory purpose, similarly to TOL Christian Schools, i.e., they would fail to maximize income-tax revenue.  *See* Verified Compl. ¶¶ 60–65 (identifying permitted uses of child day care centers, hotels/motels, hospitals, outpatient surgery centers, and business and professional offices).  These allegations create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions *could* be similarly situated.

*Id.* at 371.  Although the Sixth Circuit has not specifically adopted a test for evaluating an equal terms RLUIPA claim, it did advise, for purposes of remand, to focus on whether the assemblies or institutions being considered are similarly situated "with respect to maximizing revenue" which is the purpose of the ORC Office and Research District.  (*Id*.).  The Sixth Circuit did not suggest that the assemblies or institutions being considered be similarly situated in all relevant aspects.

Defendant argues that Plaintiff has failed to present any evidence of a similar comparator.  Plaintiff cannot rely solely on the allegations in the Verified Complaint and must present sufficient evidence as the parties have agreed to brief the case for a final ruling on the merits.  In its brief, Plaintiff has abandoned all other reference to like comparators, such as hospitals or outpatient surgery centers and instead focuses on daycare centers and partial office uses as

similar comparators to Tree of Life Christian School. Plaintiff argues that daycares and partial office use are two uses permitted in the ORC Office and Research District that fail to maximize tax revenue and are therefore similar comparators to a religious school.

### 1. Similar Comparator

As set forth above, the Sixth Circuit has defined a similar comparator as one that maximizes revenue to the City of Upper Arlington. *Tree of Life Christian Schs.*, 823 F.3d at 371 ("similarly situated with respect to maximizing revenue"). Therefore, Plaintiff must establish that a nonreligious assembly or institution permitted under the UDO generates less tax revenue than Plaintiff's intended use. Plaintiff has abandoned all but two comparators: daycares and partial office uses.[8] Plaintiff argues that both daycares and partial office uses are nonreligious institutions or assemblies allowed in the ORC Office and Research District that fail to maximize tax revenue and are therefore similar comparators to a religious school.

### a. Daycares

Plaintiff argues that daycares do not maximize income-tax revenue, but would be allowed under the Upper Arlington UDO in the ORC Office and Research District. Plaintiff offers the expert reports of Robert Siegel and Rebekah Smith as evidence in support of this argument.

Defendant responds that daycares are not a permitted use in the ORC Office and Research District. Although they were a permitted use, daycares were ultimately removed as a permitted use in the district during the pendency of this litigation. They were originally

---

[8] It is important to note that these are hypothetical comparators. Defendant provided Plaintiff with every zoning decision in the ORC district, as well as decisions from other districts, from January 22, 1991 through November 16, 2015, and not one of the decisions supports Plaintiff's argument. Plaintiff cannot identify a secular comparator similarly situated that actually received more favorable treatment under the UDO.

permitted in the district to serve an ancillary purpose, e.g. to serve the working public.  (Doc. 17, Gibson Aff.     ¶ 7).  Since the Sixth Circuit remanded this case for consideration of evidence from the parties on similar comparators and the Court is now considering the entire record for purposes of entering final judgment, the Court can consider evidence from Defendant that they currently do not permit daycares in the ORC Office and Research District and are willing to enter into an agreed judgment prohibiting any such use in the district in the future.[9]

The Court does not believe it necessary to enter an injunction prohibiting daycares from operating in the ORC Office and Research District as suggested by the Sixth Circuit, as there is no reasonable expectation that the activity will be resumed.  *See Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) ("Although voluntary cessation of wrongful conduct does not automatically render a case moot, 'the case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated.'" (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953))).  Nonetheless, the Court concludes that daycares are not permitted in the ORC Office and Research District and will enter such in the final judgment to prohibit any change in the future.[10]

Even if the Court were to consider daycares as permitted in the ORC Office and Research

---

[9] The Sixth Circuit noted that "Upper Arlington chose, during the pendency of the litigation, to exclude daycares from the ORC District.  *See* Ordinance 52-2011.  But '[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.'  *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 583 (6th Cir. 2012) . . . Here, the removal of daycares from the zone, absent an injunction that would prevent their permitting, would not remedy the alleged problem; Upper Arlington always could amend the UDO once again to allow daycares in the ORC district.  *See* Gibson Depo., R. 55 at 66 (explicitly admitting that Upper Arlington could return to the earlier UDO at any time)."  *Tree of Life Christian Schs.*, 823 F.3d at 371, n. 4.

[10] Defendant asserts that it "stopped permitting daycares, has no plans to permit daycares, and agrees to be prohibited from permitting daycares as a primary use in the ORC district."  (Doc. 101, Def.'s Reply at 5).

District, Upper Arlington argues that daycares are not similarly situated to schools because they operate differently and daycares do maximize tax revenue in the district.

The UDO defines "Child Day-Care Center" as:

Child day-care: means administering to the needs of infants, toddlers, preschool children and school children outside of school hours by persons other than their parents or guardians, custodians or relatives by blood, marriage, or adoption, for any part of the twenty-four-hour day in a place or residence other than the child's own home.

Child day-care center and type A home: means any place in which child day-care is provided, with or without compensation, for thirteen (13) or more children at one time, or any place that is not the permanent residence of the licensee or administrator in which child day-care is provided with or without compensation, for seven (7) to twelve (12) children at one time. In counting children for the purpose of this Ordinance, any children under 6 years of age who are related to a licensee, administrator, or employee and who are on the premises of the center shall be counted.

Child day-care home and type B home: means a permanent residence of the provider in which child day-care services are provided for one (1) to six (6) children at one time and in which no more than three (3) children may be under 2 years of age at one time. In counting children for the purpose of this Ordinance, any children under 6 years of age who are related to the provider and who are on the premises of the type B home shall be counted. A type B family day-care home does not include a residence in which the needs of children are administered to, if all of the children are siblings of the same immediate family and the residence is the home of the siblings.

(UDO, found at https://library.municode.com/oh/upper_arlington/codes/code_of_ordinances ?nodeId=PT11UNDEOR_ART2DE; *see also* Doc. 55–9, June 20, 2011 City Report).

As the Court has previously established, the purpose of the UDO, specifically the ORC Office and Research District, is to maximize revenue. Revenue includes "[t]ax revenues generated in connection with the Property . . . of several varieties, including personal income tax on wages earned by employees working there, entity-level income tax on the net profits of the company(ies) located there, and property tax." (Doc. 97–2, Armstrong Decl. ¶ 3).

Both parties have submitted reports from their experts comparing potential revenue generated by daycare centers to the potential revenue to be generated by Tree of Life if operating at full capacity at the Property.

Plaintiff's first expert, Robert Siegel, researched child care centers and determined that the Property could operate a child care center of with a maximum capacity of 596 children. (Doc. 96–2, Siegel Report at 4). The center would employ 159 individuals, including teachers, assistants, substitutes, and administrative and service staff. Considering industry standards, Siegel calculated that the total payroll for the operation of this center would be $3,154,470.00 annually. (*Id.*, calculations shown in chart at 5).

Plaintiff's second expert, Rebekah Smith, evaluated the total taxes collectable on the Property pursuant to the Ohio Revised Code and Upper Arlington Code of Ordinances: business income tax, property tax, and local income tax on wages. (Doc. 96–3, Smith Report at 4). The taxes are summarized by Smith as follows:

> The business income tax is levied on income reduced by exempt income to the extent otherwise included in income. Income is defined as net profit of the taxpayer. Upper Arlington's Code of Ordinances similarly describes a businesses' taxable income as the net profits from the operation of a business, profession, or other enterprise or activity. Net profit is defined as:
>
>> net gain from the operation of a business, profession, enterprise or other activity (whether or not such business, profession, enterprise or other activity is conducted for profit or is ordinarily conducted for profit) after provision for all ordinary and necessary expenses either paid or accrued in accordance with the accounting system used by the taxpayer for Federal Income Tax purposes.
>
> The tax rate applied to net profit is 2.5%. Both the ORC and the Upper Arlington Code of Ordinances provide an exemption from this tax for religious and/or charitable organizations.
>
> Ohio property tax is based on an assessed taxable value (35% of fair market value

as determined by the county auditor), and the application of a specific millage rate (one mill is one tenth of one percent). It is my understanding that Ohio property tax law is intended to maintain relatively static property tax assessments during times of fluctuations in property values. This means that the millage rate is decreased to account for an increase in taxable value and is increased to account for a decrease in taxable value so that the overall property taxes paid to the county (and ultimately to the city) will remain relatively static. Similar to the business income tax, there are exemptions from property tax for religious and/or charitable organizations.

Finally, a 2.5% municipal income tax (local income tax on wages) is imposed on anyone who earns income in Upper Arlington. In other words, all wages paid to employees working in the Building would be taxes at 2.5%.

(*Id.* at 4–5).

Ms. Smith considered the testimony of Tree of Life Superintendent Todd Marrah who stated if Tree of Life had the ability to use the Property to operates its school, it would be able to accommodate 1200 students. At capacity, Tree of Life would employ 275 staff members with an estimated payroll of $5,000,000. Tree of Life would not pay business income taxes since it is a non-profit entity. Therefore, Ms. Smith opined that Tree of Life would generate $125,000 in tax revenue on the wages. Ms. Smith further considered the information in Siegel's report and concluded if a non-profit daycare center were operated at the Property, the total payroll would be $3,154,470 annually generating $78,862 in tax revenue for Upper Arlington. If the hypothetical daycare center were for profit, Ms. Smith opined that the center would generate approximately $83,987 in tax revenue. (*Id.* at 6–7). Finally, Ms. Smith considered the actual tax data from the Property under previous owners and in 2009 Upper Arlington received $20,269 in revenue. Therefore, she concluded that "Upper Arlington's tax benefit from the Tree of Life school operations would be better as compared to the three alternate scenarios presented." (*Id.* at 7).

Defendant offers the expert opinion of Catherine Armstrong, the former Director of Finance and Administrative Services for the City of Upper Arlington. Based on her 21 years of

employment in Upper Arlington, Ms. Armstrong rebuts the opinions of Plaintiff's experts arguing they did not fully understand the taxes in Upper Arlington, or made unfounded assumptions in their calculations. For example, Ms. Armstrong points out that Ms. Smith was incorrect in assuming that property taxes remain relatively static as that only pertains to voted levies. Ms. Armstrong also emphasizes that she used actual numbers from real businesses operating in Upper Arlington, not speculative numbers like Plaintiff's experts. (Doc. 97–2, Armstrong Decl. ¶ 20–22).[11] Further, Ms. Armstrong points out that the numbers used by Plaintiff's experts would be a "never–before–seen" "giant daycare". (*Id*. ¶ 4(c)). Ms. Armstrong states that the "permitted use of a day care center would be ancillary to the main use of the building." (*Id*.). Ms. Armstrong created a chart illustrating the revenue to Upper Arlington per square foot for each permitted use, as well as daycare centers.[12] According to Ms. Armstrong, a daycare center would generate income of $4.77 per square foot, where as Tree of Life if operating at full capacity ("TOL Aspired"), would generate income of $.62 per square foot. Also, when the Property was operated by AOL/Time Warner, Ms. Armstrong averaged the income tax revenue for the 10 years and the income per square foot was $10.08. (*Id*. ¶ 22).

Upper Arlington also provided expert testimony from both Chad Gibson and Robert Weiler in support of previous motions filed with the Court. Chad Gibson also researched and opined on daycare centers. There are no daycares currently in the ORC Office and Research District. Of the daycares he was able to speak with located in Upper Arlington, the largest one

---

[11] Ms. Armstrong considered 9 categories of uses for the Property, but Plaintiff has only offered evidence that two uses are similar comparators, therefore, the Court will only consider those for purposes of this analysis. (Doc. 97–2, Armstrong Decl. Ex. C).

[12] These calculations illustrate that the permitted uses maximize tax revenue much more than schools and justify the policy behind the City's UDO.

who responded has an enrollment of 130 children. The hours for the daycares are different from schools in that there are typically no activities after 6 p.m. on weeknights and on weekends. Therefore, based on his research, he opined that daycare centers are significantly different from schools, including down to their primary purpose which for schools is "to educate students" whereas for daycares it is "to serve the general working public by providing child care for young children." (Doc. 55-2, Gibson Aff. ¶ 17).

Robert J. Weiler, Sr., with the Robert Weiler Company Realtors and Appraisers served as an expert for Upper Arlington and was asked to evaluate the Property if used as a school or daycare. Robert Weiler's background is unique in that he has his Juris Doctorate and advanced degrees in real estate and finance. He has experience in consulting, developing, real estate, and owning daycare centers. He evaluated the purpose of the ORC Office and Research District and opined that "[t]he permitted uses for the district are tailored to meet the objectives of the district. While day care facilities are providing an important service to their clientele, they are not a significant revenue producer for the city in comparison with alternative office uses particularly involving the property located at 5000 Arlington Centre Boulevard." (Doc. 60–2, Weiler Expert Report at 1–2). He continued, "[a]lthough daycares are not significant revenue producers, daycares compliment a commercial use by providing child supervision for employees in the area." (*Id*. at 2).

After careful consideration of the findings and opinions of each of the aforementioned experts, the Court finds Defendant's expert, Catherine Armstrong, to be the most credible based on her 21 years of experience as the Director of Finance and Administrative Services for the City of Upper Arlington, her specific knowledge of this issue, and the use of real-world figures. Her

findings show that a daycare located at the Property would generate seven times more tax revenue for the City than Tree of Life.

Therefore, based on the expert opinion of Catherine Armstrong, the Court finds that even if daycare centers were permitted in the ORC Office and Research District as an ancillary use, they would still generate more revenue to the City of Upper Arlington than Tree of Life. Additionally, the expert testimony of both Gibson and Weiler emphasize that even when daycare centers were permitted in the ORC Office and Research District, they were intended to be an ancillary use to compliment a commercial use, whereas a 1200–student K–12 school is not an ancillary use. Further, Tree of Life has failed to provide any evidence that a daycare center would have the same effect as a K–12 school, such as traffic patterns, extracurricular activities, etc. Accordingly, a daycare center is not similarly situated to a religious school with respect to maximizing revenue to the City.

### b.      Partial Office Uses

Plaintiff asserts that a business could purchase a building the size of the Property and use only part of it, or only staff it with a few employees, as there is no requirement that a building in the ORC Office and Research District be fully staffed. (Doc. 96–1, Pl.'s Mot. at 6). Plaintiff provides testimony that the Property went from generating personal and entity-level income tax revenue of $1,216,732.00 in 2005 to only $20,269.00 in 2009 when the prior occupants AOL/Time Warner were decreasing employment at the site. (*Id.*) (citing Doc. 18, Armstrong Aff. ¶ 6); *see also* Doc. 56, Armstrong Dep. at 16). Plaintiff concludes that "[t]his partial use of the building was permissible under the UDO and the requirements of the ORC zoning district. Yet such partial use does not maximize income tax revenue generated by the City." (Doc. 96–1,

Pl.'s Mot. at 6–7).

Defendant responds that the partial office use does not exist anywhere in the UDO, but is rather "an extrapolation from the fact that not all uses will operate at all times at peak capacity." (Doc. 101, Def.'s Reply at 8). Defendant argues, and the Court agrees, that "if a partial use is accepted as a valid comparator, then there can never be a case in which a city with the goal of maximizing revenue could ever prevail." (*Id*. at 8–9). A city can set forth the regulatory purpose, but a city cannot demand full use of a property to realize that purpose. Therefore, for purposes of the analysis of similar comparators, the Court finds it should look to the comparison of the full use of one assembly or institution compared to the full use of another type of assembly or institution. The Court has considered this in the analysis of daycares set forth above.

Tree of Life has failed to meet its burden of identifying a similar secular comparator treated more favorably under the City's UDO and therefore cannot establish a prima facie RLUIPA equal terms violation. *See Primera Iglesia*, 450 F.3d at 1313–14 (noting that "without identifying a similarly situated nonreligious comparator that received favorable treatment, Primera failed to establish a prima facie Equal Terms violation.").

## 2.    Treated Equally

The Sixth Circuit has not adopted a test for deciding whether the equal terms provision of RLUIPA has been violated.[13] Both parties argue that their respective positions will prevail no

---

[13] The Sixth Circuit in *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1004 (6th Cir. 2017), recently heard a RLUIPA substantial burden case. The Court in *Livingston* recognized that "[t]he plaintiff's own actions have also been found relevant in determining whether a burden is considered substantial. Several circuits have held that, when a plaintiff has imposed a burden upon itself, the government cannot be liable for a RLUIPA substantial-burden violation. For example, when an institutional plaintiff has obtained an interest in land without a reasonable expectation of being able to use that land for religious purposes, the hardship that it suffered when the land-use regulations were enforced against it has been deemed an insubstantial burden." *Id.* at 1004; *see also Petra Presbyterian Church v.*

matter what test this Court, and ultimately the Sixth Circuit, chooses to apply to the facts of this

case. The Sixth Circuit declined to choose among the tests in prior appeals of this case stating

that it "need not definitively choose among the various tests used by other circuits in order to

resolve this case." *See Tree of Life Christian Schs*., 823 F.3d at 370. The Sixth Circuit further

recognized that some circuits

> require that a comparator be "similarly situated" to the plaintiff religious
> assembly or institution with regard to the regulation at issue or to its purpose. For
> instance, the Third Circuit restricts comparison to "secular assemblies or
> institutions that are similarly situated [to the religious assembly] *as to the
> regulatory purpose*." *Lighthouse Inst. for Evangelism, Inc. v. City of Long
> Branch,* 510 F.3d 253, 266 (3d Cir. 2007). The Second Circuit compares the
> plaintiff religious assembly to a nonreligious assembly "similarly situated for all
> functional intents and purposes of the regulation." *Elijah Grp., Inc. v. City of
> Leon Valley*, 643 F.3d 419, 423 (5th Cir. 2011) (internal quotation marks omitted)
> (discussion *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 626
> F.3d 667 (2d Cir. 2010)); *see also Elijah Grp., Inc.*, 643 F.3d at 422–24
> (describing how the various tests using "similarly situated' language differ, while
> declining to choose among them).

*Id.*

Both parties in this case have urged the Court to apply the Fifth Circuit's test set forth in

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012). Plaintiff asserts that

although the various tests function similarly, "the clearest test that is most faithful to RLUIPA is

the Fifth Circuit's test." (Doc. 96–1, Pl.'s Mot. at 8). Defendant seems to agree, stating that

"[p]erhaps the most common test, however, exists in the Fifth Circuit." (Doc. 97, Def.'s Mot. at

---

*Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) (concluding that the plaintiff was not substantially
burdened when it had imposed the burden upon itself by purchasing property in an industrial zone for use
as a church after having been informed that its special-use application would be denied because the
relevant zoning ordinance banned churches in that zone).

    Although the case at bar involves an equal terms RLUIPA claim and not a substantial burden
claim, it is worth noting that the alleged harm suffered by Plaintiff in this case was self-inflicted. Plaintiff
was fully aware of the zoning restrictions when it purchased the building. Tree of Life was treated like
any other school would have been, irrespective of religion.

14). This test also seems to be consistent with the instruction from the Sixth Circuit on remand as it requires a court to examine "the regulatory purpose or zoning criterion behind the regulation at issue" and "whether the religious assembly or institution is treated as well as every other nonreligious assembly or institution that is 'similarly situated' with respect to the stated purpose or criterion." *Opulent Life Church*, 697 F.3d at 292–93.

There is no dispute that the City of Upper Arlington made clear to Plaintiff long before the purchase of the Property that schools were not a permitted or conditional use in the ORC Office and Research District. The purpose of the "ORC Office and Research District" is set forth in Section 5.03(A)(6) of the UDO as follows:

> [T]o allow offices and research facilities that will contribute to the City's physical pattern of planned, healthy, safe, and attractive neighborhoods. The ORC district should also provide job opportunities and services to residents and contribute to the City's economic stability.

Permitted uses generally include, but are not limited to business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, and outpatient surgery centers.

The Court finds that Plaintiff's proposed use of the Property as a school is not consistent with the regulatory purpose of the ORC Office and Research District–to maximize income, whereas permitted uses such as banks, hotels/motels, and hospitals do serve that purpose. Plaintiff, a religious school, is treated the same as every other nonreligious assembly or institution, such as secular schools, that do not maximize tax revenue as they are all prohibited from the ORC Office and Research District. Therefore, regardless of what test is applied, there is no nonreligious assembly or institution similarly situated that is being treated better than Plaintiff. Thus, Plaintiff has failed to establish that is has been treated on less than equal terms

with a similarly situated nonreligious assembly or institution.  Accordingly, there has been no unequal treatment and no RLUIPA violation, merely a neutral application of the City's zoning laws.

**B.    Eminent Domain**

Both the Sixth Circuit and Tree of Life made reference to eminent domain, however, the Court does not find that eminent domain is relevant to Plaintiff's RLUIPA claim.

The Sixth Circuit observed that the "government could ensure commercial use of the property at issue without violating the federal statute.  Using eminent domain Upper Arlington could force TOL Christian Schools to sell the land to the government, and sell the land to a buyer that the government thinks offers superior economic benefits."  *See Tree of Life Christian Schs.*, 823 F.3d at 372–77 (citing *Kelo v. City of New London*, 545 U.S. 469 (2005)).

Tree of Life, in arguing that the City's goal of maximizing tax revenue is arbitrary and unreasonable, asserts that the City is in effect "using its zoning code as a kind of eminent domain, prohibiting any use of the property it doesn't like.  In so doing, it exercises the rights of a property owner without actually owning the property."  (Doc. 96–1, Pl.'s Mot. at 3–4).

Regardless of whether the City had the ability to exercise its power of eminent domain over the Property in question, that is not an element of Tree of Life's RLUIPA claim and therefore not relevant to this case.  Further, as noted by Judge White in her dissent, "the majority's discussion of eminent domain in inapposite.  TOLCS purchased the property with knowledge of the existing zoning, and the City has no obligation to compensate TOLCS as a condition of its enforcement of its valid zoning regulations."  *Tree of Life Christian Schs.*, 823

F.3d at 382, n. 12.

### IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Final Judgment and **DENIES** Plaintiff's Motion for Final Judgment.  Final judgment shall be entered in favor of Defendant the City of Upper Arlington.

Additionally, the judgment should reflect that the City of Upper Arlington agrees to an injunction that daycares are not a permitted use in the ORC Office and Research District, nor will the UDO be amended to allow them in the district in the future.

The Clerk shall remove Documents 79 and 82 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**