# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 18, 2018

Mr. Philip W. Gerth
465 Waterbury Court, Suite A
Gahanna, OH 43230

Mr. Shawn K Judge
Mr. Mark D. Landes
Isaac Wiles Burkholder & Teetor
Two Miranova Place, Suite 700
Columbus, OH 43215

Mr. Erik William Stanley
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Re:  Case No. 17-4190, *Tree of Life Christian Schools v. City of Upper Arlington, Ohio*
Originating Case No. : 2:11-cv-00009

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. Richard W. Nagel

Enclosure

Mandate to issue

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0206p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

TREE OF LIFE CHRISTIAN SCHOOLS,

                *Plaintiff-Appellant*,

   *v.*

CITY OF UPPER ARLINGTON, OHIO,

                *Defendant-Appellee*.

No. 17-4190

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-00009—George C. Smith, District Judge.

Argued:  July 31, 2018

Decided and Filed:  September 18, 2018

Before:  GILMAN, GIBBONS, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Erik W. Stanley, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Appellant.  Shawn Judge, ISAAC, WILES, BURKHOLDER & TEETOR, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Erik W. Stanley, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Philip W. Gerth, THE GERTH LAW OFFICE, LLC, Gahanna, Ohio, for Appellant. Shawn Judge, Mark Landes, ISAAC, WILES, BURKHOLDER & TEETOR, Columbus, Ohio, for Appellee.

     GILMAN, J., delivered the opinion of the court in which GIBBONS, J., joined.  THAPAR, J. (pp. 25–40), delivered a separate dissenting opinion.

No. 17-4190          *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*          Page 2

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge.  This case arises out of a zoning dispute between Tree of Life Christian Schools (Tree of Life) and the City of Upper Arlington, Ohio.  In 2001, Upper Arlington adopted a Master Plan to guide its zoning decisions.  The Master Plan emphasizes the need to increase the City's revenue by attracting business development in the small portion of the City's land that is devoted to commercial use.  To further the Master Plan's goals, Upper Arlington's Unified Development Ordinance (Development Ordinance) restricts the use of areas zoned as an office-and-research-center district (office district) to specific uses that are primarily commercial.  The operation of schools, both secular and religious, is a prohibited use within the office district.

Despite this prohibition, Tree of Life decided in 2010 to purchase a large office building on a 16-acre tract of land that is located within the office district (the Property) for the purpose of operating a pre-K through 12th-grade school.  After failing to secure authorization from Upper Arlington to operate a school on the Property, Tree of Life filed suit in the United States District Court for the Southern District of Ohio, arguing, among other things, that the Development Ordinance violates the "equal terms" provision of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc(b)(1), by treating the school less favorably than comparable nonreligious land uses.

After two prior appeals to this court, the parties filed cross-motions for final judgment.  The district court granted Upper Arlington's motion and denied Tree of Life's, holding that the Development Ordinance is no more onerous to Tree of Life than it is to nonreligious entities that generate comparably small amounts of revenue for the City.  Because Tree of Life has not established a prima facie case under RLUIPA's equal terms provision, we **AFFIRM** the judgment of the district court.

# I.    INTRODUCTION

## A.    Factual background

### *1.    Upper Arlington's land-use policies*

Upper Arlington's Master Plan stresses the need for the City to create "new revenue" to "meet its current capital needs and support its current level of services," noting that "commercial office use provides significantly more revenue to the City than any other land use."  Commercial office use is authorized on less than five percent of the City's land.  And because Upper Arlington is landlocked and fully developed, the preservation of its office districts for commercial use is of utmost importance to the City.  The Master Plan also singles out personal income taxes as "an important source of Upper Arlington's revenues" and emphasizes that "every effort will be made to broaden and expand the City's employment base in order to increase these tax revenues."

In keeping with the Master Plan's emphasis on commercial office use and the generation of income-tax revenue, the City's Development Ordinance specifies that office-district zones within the City are meant to "provide job opportunities and services to residents and contribute to the City's economic stability."    Upper Arlington, Ohio, Unified Dev. Ordinance § 5.03(A)(6), https://library.municode.com/oh/upper_arlington/codes/code_of_ordinances?nodeId=PT11UNDEOR.  Permitted uses within the office district include "business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, bank finance and loan offices, outpatient surgery centers, [and] hospitals."  *Id.*  As previously noted, both secular and religious schools are specifically prohibited uses.  Places of worship are conditional uses, meaning that they are permitted in the office district, but only with approval from the Board of Zoning and Planning (the Board).  *Id.* art. 5, tbl. 5-C.

Child daycare centers (hereinafter, "daycares") are also prohibited uses in the office district under the Development Ordinance as presently worded.  Dev. Ordinance § 5.03(A)(6); *id.* art. 5, tbl. 5-C.  But they were permitted prior to 2011, when the City Council amended the Ordinance to exclude them in response to this litigation.  Upper Arlington, Ohio, Ordinance 52-2011 (Sept. 12, 2011).  Chad Gibson, Upper Arlington's Senior Planning Officer, testified in a deposition that the City previously intended daycares to be an ancillary use in the office district, designed not to

generate revenue but to "facilitate the general office district" by providing "a place where workers in the office complex could drop off their children during work hours in a safe environment." Although Gibson noted that "typically daycares are not massive in size," he acknowledged that the prior iteration of the Development Ordinance did not restrict their size, so a large daycare would have been a permitted use within the office district.

### 2.      *Tree of Life purchased property within the office district.*

Tree of Life, a religious nonprofit corporation, operates a private Christian school that currently serves 532 students and has a workforce of 150 employees spread across three campuses throughout the Columbus, Ohio metropolitan area.  The school believes that its lack of a unified campus inhibits its growth and limits its enrollment numbers.  Accordingly, Tree of Life began searching in 2008 for a site where it could consolidate its campuses and serve a larger population of students.

In 2009, AOL/Time Warner, a media company that is not a party to this litigation, vacated a 254,000-square-foot office building—the largest in Upper Arlington—located on the Property. AOL/Time Warner generated significant revenue for Upper Arlington during the time that it occupied the Property through a combination of property taxes and income taxes levied on both the company and its employees.  In 2001, for example, AOL/Time Warner accounted for 29% of all income-tax revenue collected by the City.

Tree of Life signed a purchase agreement for the Property in October 2009, and the sale was finalized in August 2010.  The purchase agreement contained a contingency clause that allowed Tree of Life to cancel the purchase if, prior to the closing, it was unable to obtain Upper Arlington's approval for the rezoning of the Property to allow for the operation of a school.  During the allotted time, Upper Arlington made no commitment to rezone the Property or otherwise authorize the operation of a school on the premises.  Tree of Life nevertheless decided to move forward with the purchase.

### 3.    Upper Arlington declined to accommodate Tree of Life's desire to operate a school on the Property.

Before acquiring the Property, Tree of Life filed a conditional-use application with Upper Arlington's Department of Development.  The application stated that the property would be used as a church with an included school.  The Board, however, rejected Tree of Life's characterization of its intended use of the Property, ruling that "the proposed primary use of the property as a private school does not constitute a 'place of worship, church' as that term is used in [the Development Ordinance], and is therefore not a conditional use in the [office district]."  The City Council upheld the Board's decision.  In a separate set of rulings, the Board and the City Council also rejected Tree of Life's argument that a private school should be allowed as a permitted conditional use.

During the course of this litigation, Tree of Life submitted an application to the Department of Development to request that the Development Ordinance be amended to permit private religious schools to operate in the office district.  Gibson, as Upper Arlington's Senior Planning Officer, prepared a staff report recommending that the City Council reject the amendment.  Among other criticisms of the proposed amendment, the report concluded that allowing private religious schools "within the City's extremely limited commercial areas is simply not necessary or beneficial to the City, and it is likely that negative long-term economic consequences will result."  Based on this recommendation, the City Council denied the proposed amendment.

Tree of Life next filed an application requesting that the Property be rezoned for residential use.  Echoing the reasons for his opposition to Tree of Life's first proposed zoning amendment, Gibson issued a staff report urging the City Council to reject this second proposed amendment as well.  The report noted that the northern boundary of the Property "has the greatest opportunity for intense office use" in Upper Arlington and that rezoning the Property for residential use would therefore "be contrary to the City's long-term financial interests."  Based on Gibson's recommendation, the City Council rejected Tree of Life's second proposed amendment.

### B.    Procedural background

Tree of Life filed suit after Upper Arlington rejected its conditional-use application.  The complaint alleged violations of (1) RLUIPA's substantial-burden and equal terms provisions;

(2) the First Amendment's Free Speech, Assembly, Free Exercise, and Establishment Clauses; (3) the Fourteenth Amendment's Due Process and Equal Protection Clauses; and (4) Article 1, Section 7 of the Ohio Constitution. Tree of Life seeks both equitable relief to allow it to operate on the Property and compensatory damages for the harm that it has allegedly suffered as a result of Upper Arlington's refusal to accommodate the proposed school.

Shortly after filing suit, Tree of Life moved for a preliminary injunction based on its equal protection and RLUIPA equal terms claims. Although the district court found that Tree of Life was likely to succeed on the merits of its RLUIPA claim (but not on its equal protection claim), it concluded that the other preliminary injunction factors favored Upper Arlington. The court, after balancing all the factors, denied the motion.

Upper Arlington then filed a motion for summary judgment, arguing that the case was not ripe for adjudication because Tree of Life had not yet requested that the City rezone the Property to allow the school to operate there. The district court granted the motion, *Tree of Life Christian Sch. v. City of Upper Arlington*, 888 F. Supp. 2d 883, 897 (S.D. Ohio 2012), and Tree of Life appealed to this court. While Tree of Life's appeal was pending, the school filed its first zoning-amendment application, prompting this court to remand the case to the district court. *Tree of Life Christian Sch. v. City of Upper Arlington (Tree of Life I)*, 536 F. App'x 580, 582–83 (6th Cir. 2013). Tree of Life filed its second zoning-amendment application following the remand.

On remand, both parties sought summary judgment, and the district court granted Upper Arlington's motion and denied Tree of Life's. *Tree of Life Christian Sch. v. City of Upper Arlington*, 16 F. Supp. 3d 883, 904–05 (S.D. Ohio 2014). The court held that because Upper Arlington excludes both secular and religious schools from the office district, the City's land-use regulations do not violate RLUIPA's equal terms provision. *Id.* at 899–900. With respect to Tree of Life's other federal claims, the court held that they were all either abandoned or legally deficient. *Id.* at 894 n.4, 900–04. The court declined to exercise supplemental jurisdiction over Tree of Life's state-law claim. *Id.* at 904. Tree of Life then filed a second appeal.

This court held on the second appeal that the district court erred in granting summary judgment in favor of Upper Arlington on Tree of Life's RLUIPA equal terms claim. *Tree of Life*

No. 17-4190      *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*      Page 7

*Sch. v. City of Upper Arlington (Tree of Life II)*, 823 F.3d 365, 366 (6th Cir. 2016).  According to the court, Tree of Life created a genuine dispute of material fact by making unrebutted allegations that other entities permitted within the office district are "similarly situated [to the school] with respect to maximizing revenue." *Id.* at 371.  The case was therefore remanded for the purpose of answering two specific questions:  (1) "Are there nonreligious assemblies or institutions to which the court should compare Tree of Life Christian Schools because they would fail to maximize income-tax revenue," and (2) "if so, would those assemblies or institutions be treated equally to [Tree of Life]?"  *Id.* at 372.

On remand for the second time, the parties filed cross-motions for final judgment.  Tree of Life argued, as it does in this third appeal, that daycares and partially used offices are similarly situated to the proposed school in terms of their minimal capacity to generate revenue for Upper Arlington.  *See Tree of Life Christian Sch. v. City of Upper Arlington*, No. 2:11-cv-09, 2017 WL 4563897, at *9 (S.D. Ohio Oct. 13, 2017).  Noting that the current version of the Development Ordinance does not permit daycares within the office district, the district court implied that Tree of Life's claim is moot if based on daycares as a comparator.  *Id.* at *10.  To avoid any possibility of Upper Arlington reverting to the prior iteration of the Ordinance, the court issued an injunction preserving the Development Ordinance's current ban on daycares in the office district.  *Id.* at *16.

The district court alternatively held that daycares are not similarly situated to Tree of Life's proposed school.  *Id.* at *13.  In doing so, the court found that the analysis done by Upper Arlington's expert witness, Catherine Armstrong, was more persuasive than the analyses done by Tree of Life's expert witnesses.  *Id.*  Armstrong's report demonstrated that "a daycare located at the Property would generate seven times more tax revenue for the City than Tree of Life" would generate.  *Id.*

The district court also held that "full use of one assembly or institution compared to the full use of another type of assembly or institution" is the proper lens through which to analyze RLUIPA equal terms claims.  *Id.* at *14.  Any other approach would be improper, according to the court, because a "city can set forth the regulatory purpose, but . . . cannot demand full use of a property to realize that purpose."  *Id.*  Having rejected both uses proposed by Tree of Life as

comparators, the court entered final judgment for Upper Arlington.  *Id.* at *16.  This timely appeal followed.

## II.    ANALYSIS

### A.    Standard of review

After the second remand, the parties agreed to file cross-motions for final judgment and waive any oral presentation of evidence.  This effectively amounted to a bench trial based on (1) a waiver of a jury trial under Rule 38(d) of the Federal Rules of Civil Procedure, and (2) a request that the court make findings of fact and conclusions of law based on a stipulated record pursuant to Rule (52)(a)(1).  Our standard of review is thus controlled by *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012) ("In an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*.").

### B.    Preliminary matters

#### 1.    *Tree of Life's RLUIPA equal terms claim is the only one remaining.*

In addition to its RLUIPA equal terms claim, Tree of Life initially brought several other claims.  This court upheld the district court's grant of summary judgment in favor of Upper Arlington on Tree of Life's equal protection and free exercise claims and held that Tree of Life had abandoned its state-law claim.  *Tree of Life II*, 823 F.3d at 373.  Prior to the second appeal, the district court also granted summary judgment in favor of Upper Arlington on Tree of Life's claims under the First Amendment's Establishment, Free Speech, and Assembly Clauses and the Fourteenth Amendment's Due Process Clause.  *Tree of Life Christian Schools v. City of Upper Arlington*, 16 F. Supp. 3d 883, 902–04 (S.D. Ohio 2014).  It further concluded that Tree of Life had abandoned its RLUIPA substantial-burden claim.  *Id.* at 894 n.4.

This court did not address those rulings during the second appeal.  *See Tree of Life II*, 823 F.3d at 373.  Nor did Tree of Life argue in its brief in support of its motion for final judgment or in its briefing for this appeal that any of those claims remain pending.  Among those abandoned claims is any challenge to the City's determination that Tree of Life is neither a church nor a place

of worship, so the dissent's sua sponte resurrection of that argument strikes us as unwarranted. Dissenting Op. at 36–38. Accordingly, the only remaining claim in this lawsuit is the RLUIPA equal terms claim.

### 2.     Mootness

During the second remand, the district court took the unusual step of sua sponte enjoining Upper Arlington from amending the Development Ordinance to once again permit daycares in the office district. *Tree of Life Christian Sch. v. City of Upper Arlington*, No. 2:11-cv-09, 2017 WL 4563897, at *10, *16 (S.D. Ohio Oct. 13, 2017). Upper Arlington argues that the permanent injunction moots Tree of Life's claim insofar as it depends on daycares as a comparator. But Tree of Life persuasively answers that the injunction does not moot its claim because, in addition to equitable relief, the school also seeks compensatory damages for the harm that it has allegedly suffered on account of Upper Arlington's refusal to accommodate the proposed school. *See Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 835–36 (6th Cir. 2004) (holding that a zoning amendment mooted the plaintiffs' claims for declaratory and injunctive relief, but not their claim for monetary damages).

Upper Arlington next contends that Tree of Life abandoned its money-damages claim by failing to present any evidence or argument on that issue below. The litigation up to this point, however, has focused exclusively on the issue of liability. And this court's second remand directed the district court to focus solely on whether comparators exist that Upper Arlington treats more favorably than Tree of Life. *Tree of Life II*, 823 F.3d at 372. Tree of Life thus cannot be faulted for failing to introduce evidence and press its money-damages claim when the litigation agenda set by both this court and the district court has been directed entirely to the issue of Upper Arlington's alleged liability under RLUIPA. Accordingly, Tree of Life has not abandoned its money-damages claim; nor did the district court's permanent injunction moot it.

### 3.     *Whether Tree of Life has made out a prima facie case of a RLUIPA equal terms violation was not settled by the previous appeal.*

Tree of Life in turn argues that this court has already held that the school has made out a prima facie case of an equal terms violation under RLUIPA. We disagree. This court remanded

the case to the district court because the City had failed to meet its burden at the summary judgment stage of showing that none of the permitted uses in the office district would generate less revenue for Upper Arlington than Tree of Life would.  *Tree of Life II*, 823 F.3d at 371 (holding that Tree of Life's allegations in its verified complaint "create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions *could be* similarly situated" (emphasis in original)).  In other words, because Upper Arlington did not refute the possibility of a viable comparator at the summary judgment stage, the remand afforded Tree of Life another opportunity put one forward.

> **4.**     ***The district court was not bound by its preliminary injunction conclusion that Tree of Life was likely to succeed on the merits of its RLUIPA equal terms claim.***

When the district court denied Tree of Life's motion for a preliminary injunction, it concluded that the school was likely to succeed on the merits of its RLUIPA equal terms claim, although it noted that "the likelihood of success is not overwhelming."  Tree of Life argues that the court's decision at the preliminary injunction stage predetermined that the school had made out a prima facie case, and therefore that the court erred when it subsequently concluded otherwise.

As Upper Arlington points out, however, "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits."  *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).  And here, the district court *denied* Tree of Life's request for a preliminary injunction.  The court therefore properly evaluated on a clean slate whether Tree of Life had presented a prima facie case after this court's second remand.

> **5.**     ***The Development Ordinance is facially neutral.***

In response to our questioning at oral argument, counsel for Tree of Life contended that the school has not abandoned its position that the school constitutes a place of worship.  This contention, however, will not be considered on appeal since it was not raised as an issue in Tree of Life's briefs.  *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) ("[A]n

appellant abandons all issues not raised and argued in its initial brief on appeal." (citation omitted)).

Moreover, the argument is pretermitted because this court has already held that the Development Ordinance is facially neutral and thus not subject to a facial challenge. *Tree of Life II*, 823 F.3d at 373. That determination was not simply an "off-hand comment" as characterized by the dissent, Dissenting Op. at 37 n.5, so the law-of-the-case doctrine controls. *See Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425–26 (6th Cir. 2017) (holding that, under the law-of-the-case doctrine, "we generally will not, for prudential reasons, consider issues addressed by a prior panel" absent "exceptional circumstances"). Because no such circumstances are present here, the dissent's "facial inequality" argument, Dissenting Op. at 35–38, is foreclosed.

## C.    RLUIPA's equal terms provision

We now turn to the central issue before us. In its opinion in the second appeal, this court noted a disagreement among the circuits about how RLUIPA's equal terms provision should be applied. *Tree of Life II*, 823 F.3d at 369–70. The court declined, however, to "definitively choose among the various tests used by other circuits." *Id.* at 370. Doing so was not necessary because the court held that a genuine dispute of material fact precluded summary judgment no matter which test the court applied. *Id.* Because Tree of Life now appeals a final judgment, we must decide upon a framework for analyzing the school's claim. Fortunately, the differences among our sister circuits' approaches are less substantial than they appear to be at first glance.

### 1.    *A comparator must be similarly situated to the plaintiff with regard to the regulation at issue.*

The Eleventh Circuit has determined that a prima facie case under RLUIPA's equal terms provision requires proof that "(1) the plaintiff [is] a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the [plaintiff] on less than equal terms, [compared] with (4) a nonreligious assembly or institution." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1307–08 (11th Cir. 2006). Because this is a clear and persuasive statement of the equal term provision's statutory requirements, we adopt *Primera Iglesia*'s statement of the elements. Only the third and fourth elements are at issue in this case.

The key disagreement among the circuits is about what constitutes a proper comparator for the purpose of analyzing these elements.

"In matters of statutory interpretation, we look first to the text and, if the meaning of the language is plain, then 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1106 (6th Cir. 2010) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)). But where a statute's text is ambiguous, we may consider "persuasive authority" such as "other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed" in interpreting a disputed term. *In re Carter*, 553 F.3d 979, 986 (6th Cir. 2009).

RLUIPA's equal terms provision prohibits governments from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). This language provides no guideposts for what Congress meant by the term "equal." As the Seventh Circuit recognized in *River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367 (7th Cir. 2010) (en banc), "'equality' is a complex concept. The fact that two land uses share a dictionary definition doesn't make them 'equal' within the meaning of a statute." *Id.* at 371. Specifically, "equality," in the "mathematical or scientific" sense of the word, "signifies . . . equivalence or identity," whereas in other contexts, the term connotes a "proper relation to relevant concerns." *Id.* Because the statute does not specify the basis upon which religious and nonreligious land uses should be compared, we must seek to ascertain the type of comparison that Congress intended from other tools of statutory interpretation.

Did Congress intend for the statute to require municipalities to extend preferential treatment to religious entities? We think not. Such a requirement would be inconsistent with any definition of the term "equal," and it would likely run afoul of the First Amendment's Establishment Clause. *See id.* at 370 (noting that an interpretation of the equal terms provision that is "*too* friendly to religious land uses" might "violat[e] the First Amendment's prohibition against establishment of religion by discriminating in favor of religious land uses" (emphasis in original)).

At the other end of the policy spectrum, one could plausibly read the equal terms provision *in pari materia* with the Fourteenth Amendment's Equal Protection Clause.  A plaintiff bringing an equal protection claim must be "similarly situated" to a comparator in "all relevant respects." *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)).  Tree of Life's claim would clearly fail under such a framework because the Development Ordinance excludes both secular and religious schools from the office district.  Indeed, the district court held that Tree of Life's equal protection claim failed for this very reason.  *Tree of Life Christian Schools v. City of Upper Arlington*, 16 F. Supp. 3d 883, 900–01 (S.D. Ohio 2014).

Such a reading, moreover, would render the equal terms provision superfluous.  Accordingly, no circuit employs such a cramped reading of the equal terms provision.  *See, e.g.*, *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007) ("There is no need . . . for the religious institution to show that there exists a secular comparator that performs the same functions."); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006) ("[U]nder RLUIPA['s] [equal terms provision,] a plaintiff need not demonstrate disparate treatment between two institutions similarly situated in all relevant respects, as required under equal protection jurisdiction . . . ."); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1229 (11th Cir. 2004) ("[W]hile [RLUIPA's equal terms provision] has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis.").

All of the circuits that have analyzed this issue have therefore taken a broader approach, with most holding that a comparator for an equal terms claim must be similarly situated *with regard to the regulation at issue*.  *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1173 (9th Cir. 2011); *Elijah Group, Inc. v. City of Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011); *River of Life*, 611 F.3d at 371; *Lighthouse Inst.*, 510 F.3d at 266.  The Third Circuit's approach, which compares entities in light of "the regulatory purpose," *Lighthouse Inst.*, 510 F.3d at 266 (emphasis omitted), differs slightly from the Seventh and Ninth Circuits' tests, both of which conduct the comparison in light of "accepted zoning criteria" advanced by the regulation, *Centro Familiar*, 651 F.3d at 1173; *River of Life*, 611 F.3d at 371.  And the Fifth Circuit's

approach, which evaluates comparators by reference to "the ordinance itself and the criteria by which it treats institutions differently," probably hews closer to the Third Circuit's approach than to the Seventh and Ninth Circuits' approach. *See Elijah Group*, 643 F.3d at 424.

Although it agreed with the general thrust of the Third Circuit's approach, the Seventh Circuit was concerned that a focus on "regulatory purpose" might invite jurisdictions to justify discrimination with sham purposes. *See River of Life*, 611 F.3d at 371. "'Purpose' is subjective and manipulable," the Seventh Circuit explained, "so asking about 'regulatory purpose' might result in giving local officials a free hand in answering the question 'equal with respect to what?' 'Regulatory criteria' are objective . . . ." *Id.*

The Seventh Circuit, however, offered no example of a regulatory purpose that a jurisdiction might assert as the basis for a zoning regulation that would not also be an accepted zoning criterion. And to the extent that municipalities might assert sham purposes to justify religious discrimination, that concern is addressed by the fact that all government classifications must satisfy rational-basis review. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) ("[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.").

We thus conclude that the Third, Seventh, and Ninth Circuits' RLUIPA decisions cited above represent the majority view, with their respective tests essentially the same. Our only concern is that neither the Seventh Circuit nor the Ninth Circuit directly explain what the phrase *accepted* zoning criteria actually means. In the context of their analyses, however, the word "accepted" appears to connote lawful or proper zoning criteria as opposed to unlawful ones. With this in mind, we believe that the phrase "legitimate zoning criteria" best captures the idea that the comparison required by RLUIPA's equal terms provision is to be conducted with regard to the legitimate zoning criteria set forth in the municipal ordinance in question.

The Eleventh Circuit, in contrast, strays from the majority view, at least when it comes to facial challenges to land-use regulations, by paying no heed to the regulatory purposes behind zoning policies. In *Midrash Sephardi*, the court held that "the relevant 'natural perimeter' for consideration with respect to RLUIPA's prohibition is the category of 'assemblies or institutions.'"

366 F.3d at 1230.  Under this test, if a zoning ordinance permits a particular secular assembly or institution—say, a private club—within a zone, an excluded religious assembly or institution could invoke RLUIPA to secure an exemption from the ordinance, but an excluded secular assembly or institution—say, a union hall—could not.  *See id.* at 1231 (holding that a municipality's allowance for private clubs within a zone meant that a house of worship must be permitted as well).  The Seventh Circuit has criticized this test as conferring preferential treatment to religious assemblies and institutions.  *River of Life*, 611 F.3d at 370–71.

Regardless, the Eleventh Circuit's unique and problematic test appears to apply only when the challenged regulation is discriminatory on its face.  The ordinance at issue in *Midrash Sephardi* facially discriminated against religious institutions because it prohibited houses of worship in the town's business district and, unlike with other proscribed uses, barred such entities from seeking special-use exceptions.  366 F.3d at 1219 & n.3.  In *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295 (11th Cir. 2006), however, the Eleventh Circuit clarified that when considering facially neutral land-use regulations, a "plaintiff bringing an as applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation."  *Id.* at 1311 & n.11 (emphasis in original).  And in *Konikov v. Orange County*, 410 F.3d 1317 (11th Cir. 2005) (per curiam), the Eleventh Circuit evaluated whether a comparator was similarly situated to a house of worship by considering whether permitted land uses had a "comparable community impact."  *Id.* at 1327.  Thus, when it comes to facially neutral land-use regulations, like the one at issue here, the Eleventh Circuit also requires that comparators be similarly situated with regard to the regulation at issue.

The Tenth Circuit, on the other hand, is an outlier even when it comes to facially neutral land-use regulations.  Rather than evaluating whether a comparator is similarly situated to a religious entity by reference to the land-use regulation's purpose, the Tenth Circuit weighs whether the uses, despite not being "identical," exhibit "substantial similarities" that would allow "a reasonable jury to conclude that [the entities] were similarly situated."  *Rocky Mountain Christian Church v. Board of Cty. Comm'rs of Boulder Cty.*, 613 F.3d 1229, 1236–38 (10th Cir. 2010).

No. 17-4190        *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*        Page 16

This test, in our opinion, lacks the clear guideposts that the other circuits have adopted for examining whether a comparator is similarly situated to a religious entity. Because the test is not couched in terms of the land-use regulation's purpose, a court applying it must determine which differences between entities are salient and which are insubstantial. The test therefore introduces significant subjectivity into the application of the equal terms provision. Accordingly, we adopt the majority approach, as discussed in the Third, Seventh, and Ninth Circuits' cases set forth above, and reject the Tenth Circuit's test.

In doing so, we note the dissent's critique that we (and all the other circuit courts that have analyzed the "equal terms" issue) have improperly imported the words "similarly situated" into the text of RLUIPA. Dissenting Op. at 29 & n.1. We respectfully disagree. The concept of "similarly situated with regard to legitimate zoning criteria" is simply the most reasonable interpretation of the undefined statutory words "equal terms." And interpreting ambiguous statutory language is a core function of the courts. *See United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 336 (6th Cir. 1998) ("Interpreting ambiguous statutory language, of course, is the bread-and-butter work of the federal courts."); *cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.").

## 2.        *The plaintiff bears the burden of making out a prima facie case.*

At times, Tree of Life seems to argue that Upper Arlington bears the burden of demonstrating that no conceivable permissible use in the office district is comparable to Tree of Life's proposed use. Contrary to Tree of Life's argument, however, RLUIPA's text makes clear that the plaintiff bears the initial burden of making out a prima facie case, and only if that precondition is satisfied does the burden of persuasion shift to the government. *See* 42 U.S.C. § 2000cc-2(b) ("If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of [RLUIPA's land-use provisions], the government shall bear the burden of persuasion on any element of the claim . . . .").

Moreover, once a RLUIPA plaintiff makes out a prima facie case, the litigation battle must be waged on the terms set by the plaintiff.  In other words, the government bears the burden to persuade the factfinder that the bases on which the plaintiff established its prima facie case are not supported by a preponderance of the evidence.  *See id.* (setting forth RLUIPA's burden-shifting framework).  But the statute does not impose upon the government the additional burden of conjuring up and disproving additional bases not put forward by the plaintiff that might, had they been offered, support the claim.  *See id.*

Tree of Life's suggestion to the contrary stems from this court's statement in the second appeal that the school's allegations "create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions *could* be similarly situated."  *Tree of Life II*, 823 F.3d at 371 (emphasis in original).  But the court made this remark in the context of evaluating whether Upper Arlington had produced sufficient evidence to justify a grant of summary judgment in its favor; the court was not dealing with the initial burden that Tree of Life bears in making out a prima facie case.

**D.     Upper Arlington did not violate RLUIPA's equal terms provision.**

Tree of Life argues that the asserted regulatory purpose for the exclusion of the school from the office district—revenue maximization—is not a legitimate zoning criterion, and that Upper Arlington's assertion of that regulatory purpose is pretextual.  In addition, the school puts forward nonprofit daycares, partially used offices, and publishers as comparators that are similarly situated to Tree of Life in their minimal capacity to generate revenue.  We will address each of these arguments in turn.

### *1.     Revenue maximization is a legitimate regulatory purpose.*

As mentioned above, the Seventh Circuit added the "accepted zoning criteria" gloss to the various tests put forward for evaluating equal terms claims.  *River of Life*, 611 F.3d at 371 (emphasis omitted).  That court specifically identified "generating municipal revenue" as a legitimate regulatory purpose that can be pursued by separating residential and commercial uses within a jurisdiction.  *Id.* at 373.  And the court held that the ordinance at issue there did not violate

the equal terms provision because the city "created a commercial district that excludes churches *along with* community centers, meeting halls, and libraries because these secular assemblies, like churches, do not generate significant taxable revenue." *Id.* (emphasis in original).  Tree of Life's argument is thus in conflict with the decision that adopted the "accepted zoning criteria" standard for its equal terms test.

In support of its position, Tree of Life cites cases that have rejected revenue maximization as a *compelling state interest* in the context of challenges under RLUIPA's substantial-burden prong.  *See Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1071 (9th Cir. 2011); *Elsinore Christian Ctr. v. City of Lake Elsinore*, 291 F. Supp. 2d 1083, 1093 (C.D. Ca. 2003), *rev'd and remanded on other grounds*, 197 F. App'x 718 (9th Cir. 2006); *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1227–28 (C.D. Cal. 2002); *see also* 42 U.S.C. § 2000cc(a)(1) ("No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.").  But neither the Seventh nor Ninth Circuit has held that a regulation must further a compelling state interest in order to constitute an accepted zoning criterion.  *See Centro Familiar Cristiana Buenas Nuevas*, 651 F.3d 1163, 1171–73 (9th Cir. 2011); *River of Life*, 611 F.3d at 371. Nor has Tree of Life cited any authority that supports such a proposition.

Tree of Life also cites several state-court cases that express skepticism about revenue generation as a proper regulatory purpose in certain contexts.  *See Griswold v. City of Homer*, 925 P.2d 1015, 1023 n.9 (Alaska 1996); *Bossman v. Village of Riverton*, 684 N.E.2d 427, 432 (Ill. App. Ct. 1997); *Oakwood at Madison, Inc. v. Township of Madison*, 283 A.2d 353, 357 (N.J. Super. Ct. Law Div. 1971).  But other state courts—including higher courts in some of the very states whose lower courts Tree of Life cites—have approved of revenue maximization through zoning policy.  *See Consol. Gov't of Columbus v. Barwick*, 549 S.E.2d 73, 75 (Ga. 2001) ("The City's stated interest in attracting revenue to the zoning district . . . constitutes a 'legitimate end of government' by ensuring the prosperity of the City by attracting business to the [zoning district]"

(quoting *Craven v. Lowndes Cty. Hosp. Auth.*, 473 S.E.2d 308, 310 (Ga. 1993))); *Napleton v. Village of Hinsdale*, 891 N.E.2d 839, 854 (Ill. 2008) ("It was reasonable and legitimate for Hinsdale to conclude that the continued vitality of its business districts required an appropriate balance between businesses that provide sales tax revenue and those that do not . . . ."); *Ward v. Montgomery Twp.*, 147 A.2d 248, 251–52 (N.J. 1959) (holding that a township's securement of "a new source of income [that] would serve the general economic welfare . . . through land use regulation will not warrant judicial condemnation as long as it represents an otherwise valid exercise of the statutory zoning authority").

Moreover, zoning is generally thought to be an area of "traditional state authority." *Rapanos v. United States*, 547 U.S. 715, 738 (2006).  We are accordingly loath to reject revenue maximization as a legitimate zoning criterion on the basis of a handful of state-court decisions that touch upon the issue.  Providing such a national answer to a traditionally state and local issue runs counter to the principles of federalism.

### 2.    *Upper Arlington's assertion of revenue maximization as the purpose of the Development Ordinance is not pretextual.*

Tree of Life next contends that revenue maximization is a pretextual explanation for the exclusion of schools from the office district because the Development Ordinance permits nonprofits in the district from which the city cannot collect property taxes or entity-level income taxes.  *See* Ohio Rev. Code §§ 5709.07, .12; Upper Arlington, Ohio, Revenue & Fin. Code § 203.02(C)(12)(d), https://library.municode.com/oh/upper_arlington/codes/code_of_ordinances?nodeId=PT2REFICO_CH203INTAEFJA12016.  But Upper Arlington need not tailor its zoning regulations to squeeze every last dollar out of the permitted uses within the office district to credibly claim that it has structured the Development Ordinance to generate more revenue than would be generated without the restrictions.  Moreover, Upper Arlington's 2001 Master Plan specifically identified the generation of personal-income-tax revenue as a zoning goal:

> Income taxes are an important source of Upper Arlington's revenues and every effort will be made to broaden and expand the City's employment base in order to increase these tax revenues. . . . Encouraging development that helps attract well-paying jobs will enhance the income base.  These jobs will in turn generate a higher level of income tax revenues, some of which can be targeted for regular maintenance of the City's infrastructure.

Because Upper Arlington is able to collect personal income taxes from a nonprofit's employees, the Development Ordinance's allowance for nonprofit entities in the office district does not contradict the asserted purpose of the regulation.  Nor does Tree of Life argue that the Development Ordinance has been ineffective in generating revenue for the City.  As previously noted, the prior occupant of the Property, AOL/Time Warner, accounted for 29% of all personal-income-tax revenue collected by the City in 2001.  Accordingly, Tree of Life cannot credibly argue that the asserted purpose of the Development Ordinance is pretextual.

### 3. *Daycares are the only potentially valid comparator put forward by Tree of Life.*

Tree of Life put forward only daycares and partially used offices as comparators in its brief in support of its motion for final judgment.  On appeal, the school also adds publishers as comparators and briefly mentions that outpatient-surgery centers are comparable.  But the school's expert witnesses limited their analyses of potential comparators to daycares.  Without any evidence that any other land uses generate less revenue for the City than would Tree of Life, they cannot be the foundation of a prima facie case.

As for partially used offices, the district court persuasively explained why they are not an acceptable comparator:

> [I]f a partial use is accepted as a valid comparator, then there can never be a case in which a city with the goal of maximizing revenue could ever prevail.  A city can set forth the regulatory purpose, but a city cannot demand full use of a property to realize that purpose.  Therefore, for purposes of the analysis of similar comparators, the Court finds it should look to the comparison of the full use of one assembly or institution compared to the full use of another type of assembly or institution.

*Tree of Life Christian Sch. v. City of Upper Arlington*, No. 2:11-cv-09, 2017 WL 4563897, at *14 (S.D. Ohio Oct. 13, 2017) (citations to the record and internal quotation marks omitted).  Tree of Life argues that because the Development Ordinance does not set a floor for the number of workers that a user of land can employ, partially used offices are valid comparators.

But this argument could be used to undercut almost any regulatory purpose behind a land-use ordinance.  All zoning decisions require the regulatory authority to project the effects that a particular land use will have on the municipality.  A municipality seeking to maximize revenue

must project the type of labor force that a particular land use will attract. Similarly, a municipality that is concerned about traffic congestion and noise pollution must project how each particular land use will impact those conditions.

Irrespective of the regulatory goal, however, a municipality cannot guarantee that its predictions will be borne out once its policies go into effect. But municipalities cannot be faulted for zoning decisions that utilize the best data available to make good-faith predictions in the face of such inherent uncertainties. The assumption that, as a general matter, entities within an office district will operate at full capacity strikes us as an appropriate good-faith prediction.

Moreover, Tree of Life has offered no credible explanation for why an entity that requires only a small amount of square footage for its operation would choose to situate itself in (and pay for) a 254,000-square-foot building on a 16-acre tract of land. Tree of Life's only evidence that such a use might occur in the office district is that AOL/Time Warner used the Property at partial capacity as it wound down its operations there. But this short-term situation is clearly distinguishable from the City's long-term zoning goals.

We therefore conclude that the district court correctly assumed for the purpose of its analysis that regulators can reasonably contemplate full usage of property when making zoning decisions. Accordingly, daycares are the only potentially valid comparator that Tree of Life has put forward.

### 4.     *Tree of Life presented no evidence suggesting that nonprofit daycares are similarly situated to its proposed school in terms of their capacity to generate revenue.*

Tree of Life retained two expert witnesses to make its case that nonprofit daycares are similarly situated to its proposed school in terms of their revenue-generating ability. Robert Siegel is an early-care and education consultant. Tree of Life asked him to estimate the number of employees required to operate a daycare located on the Property and the payroll that such a workforce would generate. The largest daycare with which Siegel was familiar serves 600 children. Accordingly, he based his estimates on the assumption that a daycare of that size would be housed at the office building on the Property. Siegel estimated that such a daycare would require 35,000 square feet of operating space.

He also determined that 170,000 square feet of the building on the Property is usable as a daycare.  Thus, roughly 20% of the usable space on the Property would be devoted to the daycare that Siegel envisioned.  Siegel noted, however, that the excess 135,000 square feet of usable space "opens [up] all types of possibilities that would stabilize the [daycare], greatly improve program quality, and offer a marketplace advantage."  He listed several of these ideas, including a "gymnasium, indoor playground, several larger multi-purpose rooms, a nurses' office, parent lounge, cafeteria, teacher's only area, nursing room, additional conferencing space for parent meetings, or a training room."  Siegel did not, however, offer any estimate for how much of the excess space those amenities might occupy.

According to Siegel, a workforce of 159 people would be needed to care for 600 children.  And this estimate does not appear to account for staffing of any of the "possibilities" that Siegel envisioned for the excess 135,000 square feet of usable space because his budget chart does not list employees who would staff those areas.  Siegel estimated that a workforce of 159 people would generate an annual payroll of $3,154,470.

Tree of Life retained its second expert witness, a business and financial consultant named Rebekah Smith, for the purpose of calculating the amount of income-tax revenue that various land uses on the Property would generate for Upper Arlington.  Specifically, she estimated the amount of income-tax revenue that Tree of Life's proposed school and Siegel's hypothetical daycare would generate.  In doing so, she relied on the estimates of Tree of Life Superintendent Todd Marrah, who projected that the consolidated campus would serve 1,200 students with a workforce of 275 staff members, generating an annual payroll of $5,000,000, as well as Siegel's estimates noted above.

Smith estimated, based on those numbers, that Tree of Life employees would pay $125,000 annually in income taxes to the City.  By comparison, she estimated that Siegel's hypothetical daycare would yield $83,987 in annual personal-income-tax revenue if operated as a for-profit entity and $78,862 if operated as a nonprofit entity.  Smith concluded, based on those figures, that "Upper Arlington's tax benefit from the Tree of Life school operations would be better as compared" to Siegel's hypothetical daycare.

No. 17-4190        *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*        Page 23

This analysis, however, is deeply flawed. It glosses over the partial use of the Property that Siegel's estimates reflect. Tree of Life paid AOL/Time Warner $26 per square foot for the 254,000-square-foot office building. One is hard-pressed to believe that a prudent operator of a daycare would pay approximately $5.7 million dollars for 219,000 square feet of excess space (254,000 square feet of total space minus 35,000 square feet for the hypothetical daycare) that would not be used as a daycare. (219,000 square feet of unused space x $26 per square foot ≈ $5.7 million).

The far more likely scenario is that the vast remainder of the office building would not remain vacant, but would be utilized by the landowner for productive uses other than the daycare. This would result in the Property as a whole cumulatively generating far more revenue for the City than Tree of Life would generate by itself. So an accurate picture of relative revenue-generating capacities cannot be ascertained simply by comparing the absolute amount of income-tax revenue that Tree of Life's full use of the Property would generate to the amount that would be yielded by the 35,000 square feet contemplated for Siegel's hypothetical daycare.

Upper Arlington's expert witness, Catherine Armstrong, provides a far superior basis for comparing the two entities. Armstrong, the City's former Director of Finance and Administrative Services, used actual data from the City to show how much tax revenue is yielded by various land uses that are permitted in the office district versus that produced by daycares. Rather than presenting this data in absolute terms, as Smith did, Armstrong calculated the amount of annual revenue per square foot generated by the various entities that she analyzed. This approach allows for an apples-to-apples comparison between entities of different sizes. Armstrong's data show that an existing for-profit daycare generates $4.77 in annual revenue per square foot for the City as compared to $0.62 per square foot that Tree of Life would generate. All other uses that she considered would generate revenue at even higher rates.

Not unreasonably, Tree of Life criticizes Armstrong's analysis because the daycare on which she based her calculations was a for-profit entity that paid property taxes and entity-level income taxes, whereas Tree of Life, as a nonprofit, would not pay either type of tax. But by combining the data in the reports generated by Siegel and Smith with the methodology used by Armstrong, an accurate comparison is possible.

No. 17-4190          *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*          Page 24

As mentioned previously, Siegel's payroll estimate was based on 35,000 square feet of used space. Smith estimated that a payroll of the size estimated by Siegel would yield $78,862 in annual personal-income-tax revenue for the City from employees working at a nonprofit daycare. Those figures equate to $2.25 in annual revenue per square foot of used space, which is still more than three times the amount of revenue per square foot that Tree of Life would generate. That calculation is roughly the same as the amount of annual revenue per square foot that the daycare analyzed by Armstrong provides to Upper Arlington if one excludes the property taxes that the daycare pays ($9,300 in income taxes ÷ 3,919 square feet = $2.37 per square foot).

In sum, Tree of Life has not established a prima facie case under RLUIPA's equal terms provision because it has failed to identify a permitted land use that would generate a comparably small amount of revenue for the City. Even the largest daycare with which Tree of Life's own expert witness is familiar would use only 35,000 square feet of the existing 254,000 square feet of available space in the office building on the Property. The application of Armstrong's methodology to Siegel's and Smith's data leads to the inexorable conclusion that daycares generate far more revenue on a per-square-foot basis than Tree of Life would. Accordingly, the school's equal terms claim fails.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.

No. 17-4190        *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*        Page 25

————————————

**DISSENT**

————————————

THAPAR, Circuit Judge, dissenting.  Since the founding of this nation, religious groups have been able to "sit in safety under [their] own vine and figtree, [with] none to make [them] afraid."  Letter from George Washington to the Hebrew Congregation in Newport, R.I. (Aug. 18, 1790).  In keeping with that promise over two hundred years later, Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA) to protect religious groups from discriminatory zoning laws.  But the courts have forgotten this country's sacred vow and failed to give RLUIPA the effect its written text demands.  Now our circuit does the same.  I respectfully dissent.

I.

"[A] page of history is worth a volume of logic."  *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921).  And the history of exclusionary zoning is sordid.  Initially, the practice came about when local officials sought to divide land into districts with specific uses.  But "[w]hat began as a means of improving the blighted physical environment . . . became a mechanism for protecting property values and excluding the undesirables."  Christopher Silver, *The Racial Origins of Zoning in American Cities*, in *Urban Planning and the African American Community: In the Shadows* (June Manning Thomas & Marsha Ritzdorf eds., Sage Publications 1997) (internal quotation marks omitted) (quoting noted urban planner Yale Rabin).  At first, municipalities passed zoning codes that discriminated on their face.  *Buchanan v. Warley*, 245 U.S. 60, 70–71 (1917).  But the Supreme Court struck those down.  *Id.* at 82.  So local officials employed more covert methods in the hope of evading scrutiny.  Rather than saying "no blacks allowed," zoning ordinances instead imposed minimum-size house requirements and excluded mobile homes and multiple-dwelling units in certain districts.  Andrew H. Whittemore, *The Experience of Racial and Ethnic Minorities with Zoning in the United States*, 32 J. of Planning Lit. 16, 19 (2017).  These ordinances effectively kept racial minorities out of "whites-only" neighborhoods.  *See id.*  But because municipalities cloaked these ordinances with neutral, bureaucratic concerns—such as noise, traffic, and taxable income—the courts largely upheld them.  *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365,

No. 17-4190        *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*        Page 26

394 (1926) (concluding that a municipality could exclude apartment buildings because they would destroy the "residential character of the neighborhood").

So in 1968, Congress stepped in and passed the Fair Housing Act to prevent municipalities from basing land-use laws on race, national origin, color, or familial status.  42 U.S.C. § 3604; *see also Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015) (holding that disparate-impact claims are cognizable under the Fair Housing Act).  Courts could no longer countenance neutral language masking discriminatory zoning codes.

Within a matter of years, however, other discriminatory zoning practices surfaced—this time aimed at religious groups.  Sometimes the discrimination was overt.  For example, when a Jewish group in Ohio submitted a land-use proposal, an objector at the subsequent zoning hearing told them: "Hitler should have killed more of you."  H.R. Rep. No. 106-219, at 23 (1999).  Similarly, a Pentecostal group that applied for a zoning permit heard in response:  "Let's keep these God damned Pentecostals out of here."  *Id.*  Other cases featured more subtle bias.  As they had done with racial minorities, municipalities clothed their objections to religious organizations with the same ordinary concerns: traffic, noise, and lost tax revenue.  146 Cong. Rec. 16,698 (2000) (joint statement of Senators Orrin Hatch and Ted Kennedy noting that "often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or not consistent with the city's land use plan'") (hereinafter Joint Statement).  Instead of saying "no Muslims allowed," city planners complained of the traffic on Fridays when Muslims gathered to pray.  Emma Green, *The Quiet Religious-Freedom Fight That Is Remaking America*, *The Atlantic* (Nov. 5, 2017), https://www.theatlantic.com/politics/archive/2017/11/rluipa/543504/;  *see also* H.R. Rep. No. 106-219, at 23 ("[L]and-use regulators often refuse permits for Orthodox synagogues because they do not have as many parking spaces as the city requires for the number of seats.").

These mundane justifications were as effective in excluding religious groups as they were racial minorities.  An ordinance based on traffic, for instance, prohibited churches because they generated too much traffic for a residential area but not enough traffic for a commercial area.  Joint Statement at 16,698.  As a result, "[z]oning codes frequently exclude[d] churches in places where they permit[ted] theaters, meeting halls, and other places where large groups of people assemble

for secular purposes." *Id.* And when religious assemblies challenged these ordinances, the courts offered no relief, often upholding the laws because the government had "good reason" to exclude the religious. *See, e.g.*, *Christian Gospel Church, Inc. v. City of San Francisco*, 896 F.2d 1221, 1223–26 (9th Cir. 1990) (upholding a zoning denial for a church); *Grosz v. City of Miami Beach*, 721 F.2d 729, 731–32, 741 (11th Cir. 1983) (upholding a zoning law that prohibited "organized, publicly attended religious services"); *see also First Assembly of God of Naples, Fla., Inc. v. Collier Cty.*, 20 F.3d 419, 420, 424 (11th Cir. 1994) (upholding zoning ordinance that permitted a church but denied its attached homeless shelter).

Recognizing these problems, Congress stepped in once more and unanimously enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA) to prevent municipalities from excluding religious assemblies or institutions—either overtly or covertly. Joint Statement at 16,698 ("Churches . . . are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation."). In doing so, Congress extensively documented the discrimination that RLUIPA targeted. *See River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 378–80 (7th Cir. 2010) (en banc) (Sykes, J., dissenting) (describing the history behind RLUIPA); Sarah Keeton Campbell, Note, *Restoring RLUIPA's Equal Terms Provision¸* 58 Duke L.J. 1071, 1079–85 (2009) (discussing the legislative record behind RLUIPA). Congress's attempt to address religious discrimination, however, has not been as effective. That fault lies not with Congress, but with the courts, which have added requirements into RLUIPA that prevent many religious groups from seeking the shelter that Congress sought to provide. Today, our circuit joins a host of others that have improperly written new demands into the statute's "Equal Terms" provision—to which I now turn.

## II.

When interpreting a statute, we always start with its terms. *E.g.*, *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1658 (2018). And the Equal Terms provision is plain: "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The statute thus requires a plaintiff bringing a claim to prove four elements: (1) the plaintiff is a religious assembly or institution, (2) subject to a land use regulation,

No. 17-4190     *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*     Page 28

(3) that, compared with a nonreligious assembly or institution, (4) treats the plaintiff on less than equal terms. *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307 (11th Cir. 2006). Because, as in this case, the first two elements are usually easily proven, I elaborate only on the third and fourth.

### a. Nonreligious Assemblies or Institutions

All Equal Terms cases involve a comparison between a religious entity and a nonreligious entity. And Congress selected those entities for us: "assemblies" and "institutions." 42 U.S.C. § 2000cc(b)(1); *see Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230–31 (11th Cir. 2004). But what are "assemblies" and "institutions"? Because the statute does not define those terms, courts must look to their natural and ordinary meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *Midrash Sephardi*, 366 F.3d at 1230; *see generally* Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417 (1899).

An "assembly" is "[a] group of persons gathered together for a common reason." *American Heritage Dictionary of the English Language* (4th ed. 2000); *see also Webster's Encyclopedic Unabridged Dictionary of the English Language* (1996) (defining assembly as "a group of persons gathered together, usually for a particular purpose, whether religious, political, educational, or social"). And that group of people typically has a degree of "affinity, organization, and unity around [that] common purpose." *River of Life*, 611 F.3d at 390 (Sykes, J., dissenting). Take a health club. People gather there for "exercise and athletic classes of various kinds, as well as sports and social-club meetings and team competitions." *Id.*

An "institution," on the other hand, is "[a]n established organization or foundation, especially one dedicated to education, public service, or culture." *American Heritage Dictionary of the English Language* (4th ed. 2000); *see also Black's Law Dictionary* (7th ed. 1999) (defining "institution" as "[a]n established organization, esp. one of a public character, such as a facility for the treatment of mentally disabled persons"). Institutions differ from assemblies, then, in their degree of formality and the nature of their mission—serving the common good. Your local museum, legal aid services, or even the Girl Scout headquarters would all count as institutions.

No. 17-4190        *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*        Page 29

By using such unambiguous and well-understood words, Congress made our job easy. Nevertheless, some courts have added a gloss onto this part of the statute. Rather than simply asking whether a nonreligious entity qualifies as an "assembly" or "institution," they have required plaintiffs to further show that the assembly or institution is also "similarly situated."[1] *Third Church of Christ*, 626 F.3d at 668; *River of Life*, 611 F.3d at 371; *Lighthouse Inst.*, 510 F.3d at 266. This gloss imposes a heightened pleading burden on the plaintiff.

There is one problem: Congress did not enact that burden. The Equal Terms provision prohibits local governments from treating a religious assembly or institution on less than equal terms than a "nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). "Similarly situated" appears nowhere in that mandate. And it is not for courts to assume that Congress meant something other than what it said. *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms."). Congress knew about "similarly situated" standards from the Equal Protection context and chose *not* to incorporate them into RLUIPA. Peter T. Reed, Note, *What Are Equal Terms Anyway?*, 87 Notre Dame L. Rev. 1313, 1334 (2012); s*ee Midrash Sephardi*, 366 F.3d at 1229 ("[W]hile [the Equal Terms provision] has the 'feel' of an equal protection law, it lacks the 'similarly situated' requirement usually found in equal protection analysis."). And it is beyond our court's power to write standards into legislation, even if we think that the law would benefit as a result. Judges are not entrusted with the job of writing (or rewriting) statutes. Nor am I aware of an "add-a-gloss" canon that allows a court to circumvent its defined role when it suits us. While the majority cites *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), for the proposition that courts can read words into statutes, *Marbury* commands the exact opposite.

---

[1]Some circuits have required the plaintiff to show that it is "similarly situated for all functional intents and purposes." *Third Church of Christ, Scientist v. City of New York*, 626 F.3d 667, 668 (2d Cir. 2010). Other circuits narrowed the inquiry by asking that the plaintiff show that it is "similarly situated" as to the challenged law's "regulatory purpose." *Lighthouse Inst. for Evangelism v. City of Long Beach*, 510 F.3d 253, 266 (3d Cir. 2007). The Seventh Circuit then altered the test further, looking not at a plaintiff similarly situated as to the regulatory purpose but rather one similarly situated as to "accepted zoning criteria." *River of Life*, 611 F.3d at 371; *but see id.* at 386 (Sykes, J., dissenting) (arguing that "[t]he distinction between 'accepted zoning criteria' and the 'regulatory purpose' of exclusionary zoning is nonexistent or too subtle to make any difference"). Whatever form the requirement takes, courts have read words into the statute that Congress did not provide.

Courts say what the law *is*, not what the law *should be*.  *Id.*; *see* The Federalist No. 78, at 526 (Alexander Hamilton) (J. Cooke ed., 1961) ("The courts must declare the sense of the law; and if they should be disposed to exercise will instead of judgment, the consequence would equally be the substitution of their pleasure to that of the legislative body.").  Congress gave us a plain text, and basic principles of statutory interpretation compel that we apply it as written.[2]  *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("[W]hile it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text . . . .").

Moreover, even if the plain text of the Equal Terms provision were not enough, Congress told us in the statute how to interpret the text.  Congress explicitly stated that courts are to "construe the statute in favor of a broad protection of religious exercise, to the maximum extent permitted." 42 U.S.C. § 2000cc-3(g).  This instruction should give courts pause about divining a "similarly situated" requirement into the Equal Terms provision.  Yet courts that have applied the "similarly situated" gloss have done so *because* they believed the plain meaning was "overbroad."[3]  *E.g.*,

---

[2]The majority states that "equal terms" is ambiguous without putting forth any reasons *why* it is ambiguous. Majority Op. at 16; *see Duncan v. Muzyn*, 885 F.3d 422, 425 (6th Cir. 2018) ("[S]imply calling something ambiguous does not make it so.").  As I explain, the Equal Terms provision is clear.  *See infra* Part II.  Moreover, in rushing to find ambiguity, the majority replaces Congress's enacted text with its own preferences.  As judges, we are not at liberty to use statutory ambiguity as a device to make policy from the bench.  *Cf.* Raymond M. Kethledge, *Ambiguities and Agency Cases: Reflections After (Almost) Ten Years on the Bench*, 70 Vand. L. Rev. En Banc 315, 316 (2017) ("There is nothing so liberating for a judge as the discovery of an ambiguity.  For once a judge discovers an ambiguity . . . [t]he statutory text approved by Congress and (usually) signed by the President becomes an afterthought."); *see also Yates v. United States*, 135 S. Ct. 1074, 1097 (2015) (Kagan, J., dissenting) (criticizing the use of canons of construction to create ambiguity where the "statute's text and structure suggests none" (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008))); *King v. Burwell*, 135 S. Ct. 2480, 2502 (2015) (Scalia, J., dissenting) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity [of] the statute's text." (quoting *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012))); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2134–59 (2016) (book review) (arguing against ambiguity-based decisions in statutory interpretation and suggesting a "best reading" approach to avoid policymaking by judges).

[3]Some courts have suggested that a plain meaning interpretation of the Equal Terms provision may create constitutional problems.  *River of Life*, 611 F.3d at 370; *Lighthouse Inst.*, 510 F.3d at 267 n.11.  If true, the constitutional avoidance doctrine might allow courts to give the Equal Terms provision a narrow reading to avoid the broader reading's constitutional problems.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).  But the avoidance canon has a notable exception:  Courts cannot narrow a statute if the narrower interpretation is "plainly contrary to the intent of Congress."  *Id.*  Congress gave such a contrary intent in RLUIPA when it instructed courts "to construe the statute in favor of a broad protection of religious exercise, to the maximum extent permitted."  42 U.S.C. § 2000cc-3(g).  In any event, the parties here have not argued that the Equal Terms provision runs afoul of the Constitution, so I express no opinion on the matter.  *See River of Life*, 611 F.3d at 391 (Sykes, J., dissenting) (noting that whether the Equal Terms provision exceeds Congress's authority "is an important and sensitive question that should not be resolved unless raised and fully briefed"); *but see* Campbell, *supra*,

*River of Life*, 611 F.3d at 370; *Lighthouse Inst.*, 510 F.3d at 268 (noting that under a plain meaning analysis, an ordinance that permitted a book club would also have to permit a "religious assembly with rituals involving sacrificial killings of animals"). Congress can only tell the courts what a statute means in so many ways. And when its legislatively-enacted instructions reinforce the plain meaning of the words it used, courts ought to listen. *See Yates*, 135 S. Ct. at 1101 (Kagan, J., dissenting) ("If judges disagree with Congress's choice, we are perfectly entitled to say so—in lectures, in law review articles, and even in dicta. But we are not entitled to replace the statute Congress enacted with an alternative of our own design.").

So long as a plaintiff can point to a nonreligious "assembly" or "institution," the plaintiff satisfies the third element. *See* 42 U.S.C. § 2000cc(b)(1) (requiring comparison with a "nonreligious assembly or institution"). The text requires nothing more. Neither should courts.

### b. "Less Than Equal Terms"

Once the plaintiff has identified assemblies and institutions, it must then show that the challenged law treats the religious ones on "less than equal terms" than the nonreligious ones. When Congress adopted the Equal Terms provision, it did so amidst contentious interpretations of the Free Exercise Clause. *River of Life*, 611 F.3d at 380, 378–80 (Sykes, J., dissenting). Most circuits that have reached the issue agree that this background jurisprudence shows that a law can treat religious groups on "less than equal terms" in three ways. *Primera Iglesia*, 450 F.3d at 1308.

*Facial inequality*. First, a plaintiff can show less than equal treatment if the law treats religious assemblies or institutions differently than nonreligious assemblies or institutions by its very terms. Consider an ordinance that permits social clubs but prohibits churches and synagogues. *Midrash Sephardi*, 366 F.3d at 1220. The nonreligious assemblies get in. The religious ones do not. The ordinance thus facially treats religious assemblies—churches and synagogues—on less than equal terms than nonreligious assemblies—social clubs. That is the disparate treatment that the Equal Terms provision prohibits. *Id.* at 1231.

---

at 1094–99 (explaining why a plain meaning approach has no constitutional problems under § 5 of the Fourteenth Amendment).

*Gerrymandered inequality*.  A plaintiff can also show less than equal treatment if the law in question, while facially neutral, nonetheless targets religion through a "religious gerrymander." *Primera Iglesia*, 450 F.3d at 1309 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993)).  This occurs when the law separates permissible uses in a way that burdens "almost only" religious groups.  *Id.*  Imagine a law that bans all steeples on buildings. On its face, the law looks neutral.  No building, religious or secular, can have a steeple.  But if a plaintiff can show that the ban "almost only" targets religious assemblies because only religious buildings have steeples, then the plaintiff has successfully demonstrated that the law treats religious assemblies on "less than equal terms."

*As-applied/selective inequality*.  Finally, a plaintiff can show less than equal treatment if the government selectively applies a facially-neutral law in a way that excludes religious assemblies or institutions.  *River of Life*, 611 F.3d at 383 (Sykes, J., dissenting).  Since the statutory terms do not make a distinction, courts have to look at whether the comparators actually received different treatment.  Consider, for instance, an ordinance banning all assembly halls that can hold more than 500 members.  A megachurch with over 500 members applies for a zoning exception, and the city denies the request.  But then an over-sized book club applies for an exception that the city grants.  This time, the city has "implemented" the ordinance in a way that treats religious assemblies on "less than equal terms" than nonreligious assemblies.  The city granted an exception to a nonreligious assembly (the book club) while refusing to do the same for a religious assembly (the church).

c. <u>Burden-Shifting</u>

If the plaintiff makes out a prima facie case under the Equal Terms provision, RLUIPA shifts the burden to the government.  42 U.S.C. § 2000cc-2(b).  The government could, for instance, argue that the plaintiff's selected comparators do not fit within the plain meaning of an "assembly or institution."  Maybe the plaintiff selected hotels as a comparator.  If so, a good argument that hotels do not actually qualify as "assemblies" could carry the day. *See River of Life*, 611 F.3d at 390 (Sykes, J., dissenting).  Alternatively, the government might contend that the law does not treat the religious assembly or institution on "less than equal terms."  This would be a near-impossible task when it comes to facial inequality cases.  But in either gerrymandered or as-

No. 17-4190      *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*      Page 33

applied/selective inequality cases, the government could provide evidence showing that the law in question does not actually treat religious assemblies differently. Maybe other buildings use steeples such that a ban does not "almost only" target religious uses. Or, in as-applied/selective inequality cases, the government might have evidence showing that the plaintiff did in fact receive equal treatment compared to other nonreligious assemblies or institutions. *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1173 (9th Cir. 2011). Indeed, that's where "similarly situated" *can* come into the analysis: not as a heightened pleading requirement on the plaintiff, but instead as a governmental rebuttal to an as-applied challenge. *Id.* With a truly neutral statute, courts can only analyze different treatment by digging into the context and determining whether the religious group really received "less than equal terms." *Cf. id.* at 1172; *see also River of Life*, 611 F.3d at 387 (Sykes, J., dissenting). RLUIPA puts the burden on the government, not the plaintiff, to make that showing.

One final point about the legal standard: because RLUIPA places the ultimate burden on the government, some courts have interpreted the text to include a strict scrutiny "safe harbor." 42 U.S.C. § 2000cc-2(b); *Midrash Sephardi*, 366 F.3d at 1232. For these courts, a zoning action that is a prima facie violation can be saved if the government can show that it satisfies strict scrutiny. But just as "similarly situated" does not appear anywhere in the Equal Terms provision, neither does "strict scrutiny" nor any other terms that might trigger a strict scrutiny analysis. And, again, when words do not appear in a statute, we should not add to what Congress *has* provided with what we think Congress *should have* provided. Congress could have told courts to apply strict scrutiny if the plaintiff makes out a prima facie case. In fact, Congress did exactly that—in a *different* provision in RLUIPA. Just a few lines above the Equal Terms subsection, Congress included a provision that prohibits governments from enacting land-use regulations that substantially burden religious exercise unless they have a "compelling governmental interest" and the regulation is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000cc(a)(1). We thus know that Congress was aware of the strict scrutiny buzzwords and included *none* of them in the Equal Terms provision. *Centro Familiar*, 651 F.3d at 1171 ("The Constitutional phrases, 'substantial burden,' 'compelling governmental interest,' and 'least restrictive means' are all included in the 'substantial burden' provision, not the 'equal terms' provision."); *Lighthouse Inst.*, 510 F.3d at 269 ("[W]e find that Congress clearly signaled its intent that the operation of the Equal

Terms provision *not* include strict scrutiny by the express language of [the Substantial Burden provision] . . . ."). We must respect that decision and refrain from adding it in ourselves. And that means that if governments do not carry their burden once shifted, RLUIPA holds them liable without exception.

III.

That brings us to this case. In order to generate more revenue for municipal services, the City of Upper Arlington enacted a land-use ordinance that partitioned parts of the City into office-district zones. The ordinance divided land uses into three categories. Some land uses were permitted outright, such as banks, beauty parlors, business offices, daycares, hospitals, and outpatient surgery centers. Others were strictly prohibited, including schools. And some had to apply to the City for a conditional use permit, such as places of worship.

In 2010, Tree of Life Christian Schools purchased an office building in an office-district zone. Tree of Life wanted to consolidate its three separate campuses into one central location. But Tree of Life ran into a problem: the ordinance prohibited its intended use. And the city was unwilling to grant it a conditional permit as a place of worship. So Tree of Life filed a complaint in federal court alleging, among other things, that the City's ordinance violated the Equal Terms provision.

a. <u>Nonreligious Assemblies or Institutions</u>

In its complaint, Tree of Life presented at least two possible nonreligious assemblies or institutions as comparators: hospitals and daycares. The first option is easy. Hospitals are formal establishments that provide a public good—namely, health care. Moreover, dictionaries define a hospital as a "charitable *institution*." *E.g.*, *Merriam-Webster*, https://merriam-webster.com/dictionary/hospital (2018) (emphasis added). So a hospital serves as a proper comparator under the Equal Terms provision.

Similarly, daycares are assemblies, and the parties do not argue otherwise. Parents drop their children off each day with the common purpose of leaving them with adult supervisors. And the daycare's activities center around a common purpose. From play time to nap time, everything

No. 17-4190      *Tree of Life Christian Sch. v. City of Upper Arlington, Ohio*      Page 35

in a daycare involves watching (and maybe even educating) the kids. As such, it's hard to escape the conclusion that a daycare counts as an assembly. *See River of Life*, 611 F.3d at 390 (Sykes, J., dissenting). So a daycare also serves as a proper comparator.

Even so, the City argues that daycares are not a proper comparator because its ordinance no longer allows daycares in that district. As it turns out, the City amended its ordinance to exclude daycares *after* Tree of Life filed this lawsuit, and the district court *sua sponte* issued an injunction prohibiting the City from adding them back in. Given these developments, the City now contends that the district court's injunction nullifies daycares as a proper comparator for purposes of this case. The City is wrong for two reasons. First, when Tree of Life applied for a conditional use permit, the ordinance allowed daycares without reservation while banning schools and requiring that "places of worship, churches" petition for approval. Tree of Life seeks compensatory damages for the harm it suffered because of this unequal treatment. And when a plaintiff seeks damages, courts focus on that harmful moment rather than looking at subsequent government actions. *See Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 835–36 (6th Cir. 2004) (holding that a subsequent zoning amendment did not moot claims for monetary damages). Otherwise, governments could always rewrite ordinances after-the-fact and avoid RLUIPA liability. Second, district courts cannot issue injunctions excising nonreligious assemblies from an ordinance to resolve an Equal Terms dispute. If they could, district courts could effectively nullify the Equal Terms provision by preventing plaintiffs from ever having valid comparators when bringing a claim. Plus, the proper remedy for Equal Terms violations is not to exclude the nonreligious but to include the religious. *Cf. River of Life*, 611 F.3d at 388 (Sykes, J., dissenting) ("The equal-terms provision is a remedy against exclusionary zoning; reading it to require equality of treatment with *excluded* secular assemblies . . . gives religious assemblies no remedy at all.").

### b. "Less Than Equal Terms"

Tree of Life has also presented evidence showing that the ordinance treats it on "less than equal terms" than nonreligious assemblies or institutions under both the facial inequality theory and the as-applied/selective inequality theory. I address each in turn.

*Facial inequality.* As noted above, an ordinance treats a religious assembly on "less than equal terms" if it makes a distinction on its face. And the City's ordinance does just that. The ordinance allows daycares and hospitals to set up shop while requiring that "places of worship, churches" apply for a conditional use permit. The ordinance thus requires religious assemblies to take extra steps that nonreligious assemblies do not have to take. This express distinction establishes unequal treatment. *Elijah Grp., Inc. v. City of Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011); *Centro Familiar*, 651 F.3d at 1171.

The district court erred in holding otherwise. The district court thought that, because the ordinance treated all *schools* on equal terms, the ordinance did not facially violate RLUIPA. But that comparison is too narrow. The Equal Terms provision focuses on whether the ordinance treats religious assemblies and institutions on equal terms with all nonreligious assemblies and institutions. The comparators need not be of the same species.[4] Any assembly or institution— here, church versus daycare or hospital—will do.

But the City advances another reason why the ordinance would survive a facial challenge. It contends that because Tree of Life's "proposed primary use" was to establish a private school, it does not qualify as a "place of worship, church" as that phrase is used in the ordinance. The ordinance, however, does not define "place of worship, church" or expressly exclude private religious schools from that category.

Nevertheless, the City argues that customary dictionary definitions prove that a school is not a place of worship. But the City did not actually provide any definitions. And a closer look at dictionaries reveals that the City's customary definition is not so customary. Most dictionaries define a "place of worship" as "a building where people gather to worship together." *E.g.*, *Collins English Dictionary*, https://www.collinsdictionary.com/us/dictionary/english/place-of-worship (2018); *see also Merriam-Webster*, https://www.merriam-webster.com/dictionary/worship (2018) (defining "worship" as "honor[ing] or rever[ing] . . . a divine being"). And Tree of Life's mission is to "glorify God by educating students in His truth and discipling them in Christ." R. 2, Pg. ID

---

[4]Moreover, if we limited the comparators to schools, then municipalities would always have the upper hand because they can presumably place *public* schools wherever they see fit. So public, nonreligious schools would never actually face the prohibition at issue here. Private, religious schools, on the other hand, always would.

5.  In doing so, Tree of Life "puts the Bible at the center" of its educational model and requires all students to evaluate their studies "through the lens of God's Word."  R. 2, Pg. ID 5.  So students and teachers gather together to honor God through education.  That looks a lot like a "place of worship."  In concluding otherwise, it appears that the City relied on its own subjective notions of worship—the exact unchecked discretion that RLUIPA prohibits.  Campbell, *supra*, at 1082 ("[Z]oning laws are 'commonly administered through individualized processes not controlled by neutral and generally applicable rules.'" (quoting H.R. Rep. No. 106-219, at 24)); *see* Joint Statement at 16,699 ("Churches . . . are often frequently discriminated against . . . in the highly individualized and discretionary processes of land use regulation.").  As such, the City's ordinance facially discriminates, and the City used the ordinance to discriminate against Tree of Life.  The City is liable.[5]

The majority claims that Tree of Life cannot succeed under a facial challenge because it abandoned any argument that it is a "place of worship."  Majority Op. at 10.  But the majority misses the bigger picture.  Tree of Life brought one claim:  under RLUIPA, the City's ordinance treated it on "less than equal terms" than nonreligious assemblies or institutions.  And it advanced multiple arguments to support that claim.  When the district court held that the ordinance did not violate the Equal Terms provision, that judgment subsumed all of those arguments.[6]  Yet, on appeal, Tree of Life continues to press the same claim, supported (if not in the exact same words) by the same arguments.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374,

---

[5]In a prior appeal, this court made an off-hand comment about the ordinance being neutral for constitutional purposes.  *Tree of Life Christian Schs. v. City of Upper Arlington*, 823 F.3d 365, 373 (6th Cir. 2016).  That statement, however, did not constitute a holding.  The court mentioned facial neutrality in only one sentence with no reasoning—and it did so in the *constitutional* context, not in the *Equal Terms* context.  Because this court did not squarely consider whether the ordinance here was facially neutral, the law-of-the-case doctrine does not prevent us from holding otherwise.  *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017) (noting that the law-of-the-case doctrine "does not extend . . . to issues not 'fully briefed [or] squarely decided in an earlier appeal'" (quoting *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016))).

[6]Because the district court used the wrong legal framework, we should at the very least remand to the district court to determine whether the ordinance is facially neutral under the Equal Terms provision.

379 (1995) ("Our traditional rule is that '[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.'" (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992))).  At oral argument, Tree of Life contended that it is a place of worship and that it has not abandoned its facial argument.  Oral Arg. at 1:27–3:45.  And Tree of Life's brief contains everything necessary for that argument.  In making its as-applied argument, Tree of Life also discussed all the necessary elements for the facial argument, just without the labels.  *Cf. McNeal v. Kott*, 590 F. App'x 566, 569 (6th Cir. 2014) (holding that, in the qualified immunity context, "[o]ne does not forfeit [an argument] by making [other] arguments that, if accepted, establish [the first argument]").  Plus, in its opposing brief, the City classifies "Tree of Life [a]s a school, not a church" to argue that its ordinance is nondiscriminatory.  Appellee Br. 5, 44.  Therefore, in the court's analysis of the ordinance, the City's proffered classification of Tree of Life—as a school and not a place of worship—should not be beyond judicial review just because Tree of Life did not use "magic words" in its own brief.  *See* Campbell, *supra*, at 1103 (criticizing Equal Terms jurisprudence that "removes a government's regulatory objectives from judicial scrutiny").

*As-applied/selective inequality*.  Tree of Life also demonstrated that the ordinance violates the Equal Terms provision under an as-applied/selective inequality theory.  Even assuming Tree of Life does not qualify as a "place of worship," it still faced a blanket ban, which other nonreligious assemblies and institutions did not.  The ordinance bans schools, including Tree of Life.  But the ordinance permits some nonreligious assemblies and institutions as of right— daycares and hospitals needed to do no more than set up shop in the district.  So when the City denied Tree of Life's use—despite allowing daycares and hospitals without question—it treated Tree of Life on "less than equal terms" than nonreligious assemblies and institutions.

### c. Burden-Shifting

The City makes two arguments to rebut Tree of Life's prima facie case.  Both are unavailing.

*Tax Revenue*.  First, the City argues that it did not treat Tree of Life unequally because every other comparator—daycares and hospitals included—produced far more tax revenue to the

City than Tree of Life ever could.  Thus, according to the City, it treated Tree of Life equally: revenue generation is what counts in zoning decisions under the ordinance, and Tree of Life produces less revenue.  But that is only true if you let the City decide how to quantify revenue after the fact.  For instance, one could measure revenue in total dollars.  And under that metric, Tree of Life generates more tax dollars than the existing daycares in the district.  But (at least in this case) the City does not want the courts to look at total dollars—only revenue *per square foot*.  This tactic feels a lot like "heads the City wins, tails Tree of Life loses."  And if cities can take a vague regulatory purpose and define the parameters during the course of litigation, they can always avoid RLUIPA liability.  All they have to do is find the parameters that make them win.  *See River of Life*, 611 F.3d at 371 (criticizing the use of regulatory purpose as a "guide to interpretation" because such a use would make RLUIPA turn on the subjective notions of local officials).  Of course, if the ordinance itself mandated a particular way of calculating revenue, the case might be different.  But here, the City's formula is something of a liability-avoiding chameleon.

*Schools.*  The City also argues that, irrespective of tax revenue, it did not treat Tree of Life differently *because of* religion.  Rather, the City prohibited Tree of Life because it was a *school*. And since the ordinance prohibits *all* schools, the City did not treat Tree of Life on "less than equal terms" than any other school.  That argument fails for two reasons.  First, the City did not need to treat Tree of Life differently *because of* religion to violate the Equal Terms provision.  RLUIPA has an entirely separate section dealing with discrimination *because of* religion.  42 U.S.C. § 2000cc(b)(2).  The language of the Equal Terms provision, by contrast, requires no motive or bias. *River of Life*, 611 F.3d at 382 (Sykes, J., dissenting).  The plain language targets *all* unequal treatment.   Reading intent into the Equal Terms provision would make the separate Antidiscrimination provision superfluous.  And that is something that ordinary principles of statutory interpretation forbid us from doing.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect . . . to every word Congress used.").

Nor does pointing to a blanket ban on schools suffice to show that the City's treatment of Tree of Life was equal.  Here again, the City's argument hinges on limiting the relevant inquiry to comparing schools.  But the Equal Terms provision broadens the inquiry to all assemblies and institutions—after all, Tree of Life made out a prima facie case by showing that it had been treated

differently from a daycare or a hospital. So rebutting Tree of Life's prima facie case is not as easy as labeling Tree of Life a school and a daycare not a school. The City must justify treating schools differently from daycares or hospitals. And it has not done so.

Accordingly, the City did not meet its burden of rebutting Tree of Life's prima facie case. It is liable under RLUIPA, and I would reverse.

*       *       *

There comes a time with every law when the Supreme Court must revisit what the circuits are doing. That time has come. Every circuit to address the issue has given its own gloss to the Equal Terms provision. Whether a religious plaintiff can succeed under the Equal Terms provision thus depends entirely on where it sues. And not only have the circuits split on the issue, but many of them have also neutralized the Equal Terms provision. By importing words into the text of the statute, the courts have usurped the legislative role and replaced their will for the will of the people. *See* The Federalist No. 47, at 325 (James Madison) (J. Cooke ed., 1961) ("Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator." (quoting 1 Baron de Montesquieu, *The Spirit of Laws*)).

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-4190

TREE OF LIFE CHRISTIAN SCHOOLS,

    Plaintiff - Appellant,

     v.

CITY OF UPPER ARLINGTON, OHIO,

    Defendant - Appellee.

> **FILED**
> Sep 18, 2018
> DEBORAH S. HUNT, Clerk

Before:  GILMAN, GIBBONS, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk